# STATE OF CONNECTICUT *v.* TRENDEL TUTSON
## (SC 17287)

Sullivan, C. J., and Borden, Norcott, Palmer and Zarella, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued November 29, 2005—officially released June 27, 2006

*Michele C. Lukban*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, *Warren Maxwell*, former senior state's attorney, and *Roseanne Wagner*, senior assistant state's attorney, for the appellant (state).

*Mark Rademacher*, assistant public defender, for the appellee (defendant).

*Opinion*

ZARELLA, J. The state appeals, following our grant of certification, from the judgment of the Appellate Court reversing the conviction of the defendant, Trendel Tutson, of attempt to commit murder in violation of General Statutes §§ 53a-54a and 53a-49, and assault in the first degree in violation of General Statutes § 53a-59 (a) (5). The state claims that the Appellate Court improperly reversed the defendant's conviction on the ground that the trial court's exclusion of certain alibi testimony deprived him of his right to present a defense under the United States constitution.[1] The state specifically challenges the Appellate Court's conclusion that the trial court (1) improperly determined that the testimony of a key defense witness constituted an alibi, and (2) abused its discretion in excluding the proffered testimony as a reasonable sanction for the defendant's failure to satisfy the alibi notice provisions of the rules

---

[1] We granted the state's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the defendant was entitled to a new trial because the trial court's ruling improperly precluded his proffered alibi evidence under Practice Book § 40-21?" *State* v. *Tutson*, 271 Conn. 935, 936, 861 A.2d 511 (2004).

of practice. The state also claims that the trial court improperly merged the defendant's sentences and requests that the case be remanded to the Appellate Court to resolve that claim if the Appellate Court's decision is reversed. We agree with the state and, accordingly, reverse the judgment of the Appellate Court and remand the case to that court with direction to consider the sentencing claim.

The opinion of the Appellate Court sets forth the following relevant facts that the jury reasonably could have found. "[O]n March 26, 2001, between 1 and 1:30 p.m. . . . Ernesto Molina was driving a 1992 red Volkswagen Jetta on Bond Street in Hartford, looking to buy marijuana. Molina was joined by two passengers, Jorge Pagan, Molina's best friend, who sat in the front passenger seat, and Michael Alvarado, who sat in a backseat. As the vehicle traveled on Bond Street, Molina and Pagan noticed a small white car traveling toward them in the opposing lane. They also noticed that there was a passenger in the front seat. As the cars passed, Molina and Pagan saw the face of the driver of the white car.

"After the vehicles passed, the white car turned around and, with increasing speed, began following the red Jetta on Bond Street. Molina and Pagan noticed this and became concerned. In an attempt to elude the car, Molina increased his speed to eighty-five to ninety-five miles per hour and drove through stop signs and traffic lights. Molina ultimately turned onto Brownell Avenue and the white car did the same. As the cars were traveling at fifty-five miles per hour, Molina looked in his rearview mirror and saw a long black pole, which he thought was a rifle, come out of the driver's side window of the white car and turn in the direction of the Jetta. Molina then heard a noise and felt something strike the back of his head. A large caliber bullet had pierced the back of the Jetta and traveled through the vehicle's trunk and passenger compartment. A fragment

of that bullet lodged in the back of Molina's head. Although injured, Molina kept driving, turning right onto Broad Street and continuing to Hartford Hospital. The white car did not follow the Jetta, turning left onto Broad Street instead.

"At the hospital, the police immediately were notified of the incident. They arrived at the hospital shortly thereafter and briefly spoke with Molina, Pagan and Alvarado regarding the shooting. The police also conducted a formal interview of Pagan at the police station during which Pagan described the driver and passenger of the white car.

"Approximately one hour after arriving at the hospital, the police were contacted by the security department from the Learning Corridor (Corridor). The police were told that a member of the Corridor's security personnel was walking to lunch between 1 and 1:30 p.m., when he heard what sounded like a gunshot resonating from Brownell Avenue. The police also were notified that this security officer searched Brownell Avenue after he learned about the shooting and recovered a twelve gauge shotgun shell from the north side of the street. The police ultimately took the shell into their possession. At that time, it was neither dirty nor rusty and did not appear to have been on the street for a long time. The shell, however, was never tested for fingerprints. The police also took a videotape from the Corridor's exterior surveillance camera. That tape revealed that two vehicles, one red, one white, were on Brownell Avenue and that the red vehicle turned right onto Broad Street while the white vehicle turned left. Neither gunfire nor the make of the vehicles could be discerned from the video[tape]. In addition, the video[tape] was [time-stamped] in a manner that made it unclear that the events depicted actually occurred on March 26, 2001.

"Approximately twelve hours after the shooting, at roughly 2 a.m. on March 27, 2001, Pagan, while driving to a gas station to buy a beverage, observed that he was being followed by the defendant in a white Dodge Neon (Neon). Pagan immediately notified police officers that the vehicle that had been involved in the earlier shooting was following him. The police located the Neon and pursued it, but it fled, turning its headlights off in the process. Shortly thereafter, the police located the vehicle in the rear yard of 51 Whitmore Street. The vehicle appeared abandoned; the engine was not running, although it was still warm, and the doors were wide open. A short distance away, the police found the defendant and Philip Washington hiding beneath some cars. Thereafter, the police brought Pagan to the scene where he positively identified the defendant as the driver of the Neon in the earlier shooting and Washington as its passenger.

"The police subsequently discovered that Rooty Thomas [Rooty], who lived in Meriden, was the lessee of the Neon. Once contacted, Rooty . . . gave the police permission to search the vehicle.

"The police performed gunshot residue tests on the hands of the defendant and Washington as well as on the exterior and interior surfaces of the driver's and passenger's doors of the Neon. These tests disclosed lead particles on the palm of the defendant's left hand as well as on the back of his right hand. They further revealed the presence of lead, barium and antimony on the palm of Washington's left hand and lead particles on the exterior of the vehicle's passenger door.

"On April 5, 2001, Molina identified the defendant from a photographic array shown to him by the Hartford police and, on March 8, 2002, Pagan did the same. No weapon was ever recovered." *State* v. *Tutson*, 84 Conn. App. 610, 612–15, 854 A.2d 794 (2004).

On April 13, 2001, nearly one year prior to the start of the defendant's trial, the state sent the defendant a demand for written notice of his intention to offer an alibi defense pursuant to Practice Book § 40-21. The state specifically requested notice of "the place claimed to have been and the names and addresses of the witnesses upon whom [the defendant] intends to rely to establish such alibi. The crime[s] charged against the defendant are alleged to have occurred on the following date, time, and place: [March 26, 2001]; 1:35 [p.m.]; BROAD STREET AND BROWNELL AVENUE, HARTFORD . . . ."

On August 6, 2001, the defense sent a letter to the state via facsimile identifying Julia Thomas (Julia) as the only alibi witness. The letter contained no information, however, regarding the defendant's whereabouts at the time the crime was committed. The defense also provided the state with a three page investigative report[2] dated April 19, 2001. The report was based on a personal interview with Julia[3] and a telephone interview with her son, Terrell Thomas (Terrell).[4] Although the report

---

[2] There is no indication in the record as to the date that the state received the report.

[3] In her interview, Julia stated that, upon returning home from grocery shopping between 12:30 and 1 p.m. on the day of the shooting, she saw the defendant's girlfriend sitting in a white Dodge Neon parked outside her residence. Thereafter, when Julia entered her residence, she found the defendant visiting with her sons, Terrell Thomas and Tyrone Thomas. The defendant greeted her warmly but told her that his girlfriend was waiting outside in the car and that he could not stay long because they had to pick up his girlfriend's children. He departed a short time later.

[4] The investigator's report indicated that the interview was with Tyrone Thomas, Julia's other son. The defense stated at trial, however, that the report was incorrect and that the interview was with Terrell.

Terrell was a close friend of the defendant's who lived in Alabama and was visiting Julia during the last week of March, 2001, at the time the crime was committed. In his telephone interview, Terrell confirmed that the defendant was visiting Julia's home at approximately 1 p.m. on the day of the shooting while the defendant's girlfriend waited outside in the car. Terrell also confirmed that the defendant did not stay long because he and his girlfriend had to pick up her children in another town and that he had accompanied the defendant and his girlfriend during the trip.

referred to the defendant's "girlfriend" and listed the name of Rooty as a subject to be interviewed, it did not name Rooty as a prospective witness and did not identify her as the defendant's girlfriend.

The trial commenced on March 11, 2002. The state alleged that the defendant was guilty as a principal or an accessory of criminal attempt to commit murder and assault in the first degree. In the bill of particulars dated March 11, 2002, the state specifically alleged that, "[o]n [March 26, 2001], at approximately 1:30 p.m., the defendant was the operator of a 1997 white Dodge Neon proceeding east on Bond Street" and that "Washington was his front seat passenger in the . . . Neon." The state further alleged that the defendant had engaged in a car chase with Molina, who was driving a red Volkswagen Jetta carrying two other passengers, and had fired a shot at the Jetta, or had assisted Washington in shooting at the Jetta, thereby causing physical injury to Molina. The defendant, relying on theories of misidentification[5] and alibi, attempted to convince the jury that the two eyewitnesses to the shooting incorrectly had identified him as the perpetrator because, at the relevant time, he was in another location and thus could not have committed the alleged offenses.

---

[5] The defendant argued that the two eyewitnesses, Molina and Pagan, improperly identified him as the driver of the vehicle involved in the shooting because he was at another location at the time of the shooting. State v. Tutson, supra, 84 Conn. App. 615. In support of this argument, defense counsel's cross-examination of Pagan revealed certain inconsistencies in his testimony and the fact that Pagan had discussed with Molina the identity of the person driving the Neon after the shooting occurred. Id., 616. The defense thus suggested that "Molina's memory had been influenced by Pagan's version of the events . . . ." Id., 618. Molina also testified that he had smoked marijuana two weeks prior to the shooting and that, since his hospitalization for wounds caused by the shooting, he sometimes had bad migraine headaches and could not "think straight." Id. Finally, the testimony of Alan Wu, director of Hartford Hospital's chemistry and toxicology laboratories, and Rocco Orlando III, Molina's attending physician, called into question Molina's credibility as well as his ability to recall accurately the identity of the Neon's driver. Id., 619.

As the state was nearing the end of its case-in-chief, defense counsel represented to the court, outside the presence of the jury, that she had given the state the names of Julia and her sons, Terrell and Tyrone Thomas (Tyrone), as alibi witnesses. An extended discussion followed as to whether the defendant had provided the state with adequate notice to admit the proposed alibi testimony, in particular that of Tyrone. The state argued against admission of Tyrone's testimony because Julia was the only alibi witness named in the defendant's August 6, 2001 response to the state's demand for written notice of an alibi defense. The state additionally argued that the investigative report, which defense counsel also had characterized as written notice of the defendant's intention to offer an alibi defense, did not identify Terrell and Tyrone as alibi witnesses and did not provide information regarding the defendant's whereabouts at 1:30 p.m., when the crime allegedly was committed. The court also expressed skepticism as to whether Tyrone's proposed testimony constituted an alibi because it would have referred to a time prior to the shooting and because of the proximity of the crime scene to Julia's residence.

During this discussion, defense counsel declared that the defendant's "strongest" alibi witness was Rooty. When the state protested that it had not been given notice that Rooty would testify as an alibi witness, defense counsel replied that she had included Rooty on the defense witness list, although counsel was having difficulty locating her. Upon further inquiry by the court, defense counsel stated that if Rooty could be located and was allowed to appear as an alibi witness, she would testify that she and the defendant went to New Haven following his visit with Terrell to pick up her child or drop off her nephew.

The court noted that the defense had not given the state proper notice that Rooty would testify as an alibi

witness and characterized the lack of timely notice as bordering on "egregious." The court declared: "[A]libis that come into play close to the time of trial are always really suspect. I mean, if there's a legitimate alibi, it's usually put into play early on, next to the time of the alleged offense. . . . I want to give you latitude. . . . [I]t almost appears as a conscious effort not to give them alibi [notice] and to spring a surprise on them." The court reserved ruling on the matter, however, until after the defense had made an offer of proof.

That same day, prior to the testimony of the state's final witness, the defense filed the following notice of alibi with the court: "[O]n the date of [March 26, 2001] at approximately [1] and 1:20 [p.m.], the defendant . . . was at the home of . . . Julia . . . and Tyrone . . . located at 827 Wethersfield Avenue, Hartford . . . .

"[O]n [March 26, 2001] at approximately 1:20 until [3 or 4 p.m.], the defendant . . . was in the company of Terrell . . . and Rooty . . . (who are not related to each other) [en] route to and from Meriden and New Haven . . . where Rooty . . . had to pick up her . . . child from school."

After the state concluded its case-in-chief, defense counsel reiterated to the court, outside the presence of the jury, that if Rooty was located and permitted to appear as an alibi witness, she would testify that the defendant left Julia's residence at approximately 1:20 p.m. on the day of the shooting and accompanied her to Meriden and New Haven to pick up her child. The court responded: "In all likelihood . . . I'm not going to allow that because I don't think it's—not only [is it] not in compliance but it avoids the whole spirit of having alibi witnesses. The only way I got the door open a crack for you—otherwise I'd dismiss it completely—is that, in this investigative report in the last paragraph, buried in there, it mentions that Meriden-New Haven

trip. That's the only reason I'm keeping the door open [slightly]."

Additional discussion ensued as to whether Julia should be allowed to testify as an alibi witness regarding events that transpired after 12:30 to 1 p.m. but that were not described in the investigative report. The court ultimately concluded: "The best thing is to have adequate notice. . . . I want to keep the door open because of Rooty [who is] in this report. What's more troubling is your subsequent report dated August [6, 2001, that] says just Julia. . . . So you're saying, here's our alibi witness, Julia. No time given. No place where the person is. You've got her address. That's not saying the defendant was there. So it seems to me that this subsequent letter obviates the investigative report and says, this is our alibi, Julia."

The following day, defense counsel informed the court that she finally had located Rooty, who would be available to testify later that day. The court replied that, because defense counsel had failed to comply with the applicable rules of practice, it would allow Rooty to testify as an alibi witness only if the state was given an opportunity to interview her first. Defense counsel initially agreed to this proposal but then informed the court that she no longer wanted to offer Rooty as an alibi witness because she had learned that Rooty was not with the defendant at the time of the shooting. The court responded that, in those circumstances, the defense had "an absolute right" to call Rooty as a regular witness.

Thereafter, Julia testified in a manner generally consistent with the investigative report, stating that the defendant was visiting her sons, Terrell and Tyrone, when she returned home from grocery shopping between 12:30 and 1 p.m. on the day of the shooting and that he left at approximately 1:10 to 1:15 p.m. She

further testified that the defendant had stated upon leaving that his girlfriend was waiting outside in her car. Julia described the vehicle, which she had seen when returning to her residence a short time earlier, as a small white car with a child inside.

Rooty subsequently testified that she drove the defendant to Julia's residence to visit his friend Terrell between 12:30 and 1 p.m. on the day of the shooting. Before she could testify further, however, the state objected, outside the presence of the jury, to further questioning of Rooty because it appeared that she was about to give alibi testimony. Defense counsel responded that Rooty was going to testify that, after she dropped the defendant off at Julia's residence, she left the area and returned to pick him up around 2 p.m. When the court noted the conflict between the proffered testimony and Julia's testimony that the defendant had left her residence shortly after 1 p.m., the defense responded that Rooty was not an alibi witness because she would not be testifying as to what the defendant did between the time she dropped him off and the time she picked him up. The court disagreed, stating that "[t]he only way [such testimony] could be relevant is that it's relevant to an alibi that from [1 to 2 p.m. the defendant] was at . . . [Julia's] house."[6] The state

---

[6] The court further explained: "We're right back to where we were. To me, the most clear-cut defense is an alibi defense. And the law requires that you assert it with specificity. It's a very simple defense. But in its simplicity, it's also a very damaging defense against the state because it says the defendant . . . is elsewhere. . . . [T]here's an issue of whether you gave proper notice. The state says you didn't. I agree with the state. You didn't. . . . Now, you're trying to put it in—I don't mean this in a negative way, but through the back door, that he's at [Julia's residence] from 1 to 2 [p.m.]. . . . [W]e have what we call inferences that I've explained to the jury. . . . [T]he only inference [the jury] can draw [is that] you're asserting an alibi. . . . You're not labeling it that but you're asserting an alibi that [Rooty] dropped [the defendant] off at 1 [p.m.]. She went to do whatever business she had and she comes back to [Julia's residence] at 2 [p.m.]. . . . And he's there. . . . [T]he reasonable inference to draw is that he was there between 1 and 2 [p.m.]."

moved to strike Rooty's testimony on the ground that it constituted an alibi. The court noted that it had tried to be fair to both sides by allowing Rooty to testify as an alibi witness, despite the lack of adequate notice, as long as the state was given an opportunity to interview her before she took the stand, but that defense counsel had rejected this proposal and informed the court that Rooty was not going to testify as an alibi witness.

Defense counsel then revealed that she was trying to "get around the alibi issue problem" by establishing that the Neon was in another location[7] when the shooting occurred and that the jury was free to make whatever inferences it wished with respect to the defendant's whereabouts during that time. The court responded that, regardless of the vehicle's location, the most significant inference to be drawn from Rooty's testimony was that the defendant was at Julia's residence at the time of the shooting. Concluding that defense counsel was "playing a game," the court observed that it had given the defendant the benefit of the doubt by interpreting tangential references in the investigative report to the defendant and his girlfriend going to Meriden and New Haven after 1 p.m. as partially satisfying the notice requirement for Rooty's alibi testimony. It also observed, however, that Rooty's testimony was, in effect, a different alibi about which the state had not been notified properly.

Defense counsel ultimately agreed that the most recent version of Rooty's testimony would support an inference that the defendant was at Julia's residence between 1 and 2 p.m. but persisted in arguing that the testimony should be admitted. The court responded that defense counsel was missing the point because it

---

[7] Defense counsel noted that Rooty would testify that she was driving her Neon in the north end of Hartford around the time of the shooting.

was exactly this inference that constituted the alibi. When defense counsel replied that she was trying to "get around" the notice issue, the court reminded counsel that the point was not to "get around the law" but to "support the law . . . ." Defense counsel then asked the court if it would consider renewing its invitation to permit Rooty to testify as an alibi witness if the state were allowed to interview her first. In the discussion that followed, defense counsel again conceded that the effect of the proffered testimony was to suggest that the defendant was at Julia's residence between 1 and 2 p.m. The court ultimately precluded Rooty from giving any further testimony concerning events after 1 p.m. but declined to strike the testimony that she had given up to that point.

The state then noted that Rooty's testimony that the car was in another location constituted an alibi defense because the state's theory of the case was that the defendant was operating Rooty's Neon when the crime was committed. According to the state, testimony that the car was elsewhere supported an inference that the defendant was elsewhere. The state also contended that, because its case was built on the premise that the defendant was driving the Neon when he committed the crime, testimony regarding the location of the Neon apart from the defendant's whereabouts would have no relevance. The court agreed, concluding that the relevance of the vehicle's location was intrinsically linked to its connection with the defendant: "To say the car is elsewhere is to say the defendant is elsewhere. That's an alibi. . . . I don't see how the vehicle or its whereabouts [have] any relevance to this case whatsoever except as to the defendant."[8] After Rooty returned

[8] The court concluded: "I'm not going to, under these circumstances, the totality of the circumstances, where this morning I was ready to invite, to hear the so-called alibi witness and, over the state's strong objection that [it] had no notice, I was going to invite the [state], if [it] . . . wanted, to interview the witness, see if [it] wanted a continuance. And under that scenario, we were under the impression that, based on the investigative

to the stand, defense counsel did not inquire further regarding her activities after she dropped the defendant off at Julia's residence.

In the proceedings that followed, the state elicited rebuttal testimony from Detective Andrew Weaver of the Hartford police department that Rooty had stated in an interview that was conducted shortly after the crime was committed that the defendant had asked her if he could use her Neon on the morning of March 26, 2001, that she had assented to his request and that she was unaware of the location of the vehicle until Weaver had contacted her after the shooting. *State* v. *Tutson*, supra, 84 Conn. App. 619–20. In accordance with defense counsel's request, the court thereafter gave an alibi instruction that the defendant claimed he was elsewhere at the time of the alleged offenses.

At the conclusion of the trial, the jury found the defendant guilty of attempt to commit murder and assault in the first degree. The court rendered judgment

---

report of April 19, 2001, that the witness was going to say that [she and the defendant] were in transit between Meriden and New Haven until about 4 [p.m.]. I invited that. The defense said, 'Nope, we're not going to use her for an alibi.' The testimony of leaving him off at [Julia's residence] at 1 [p.m.] and picking him up . . . at 2 [p.m.] is in the nature of [an] alibi. The only inference the jury can reasonably make is [that], between 1 and 2 p.m., he's at [Julia's residence]. That's [an] alibi.

"As far as . . . Rooty . . . having the vehicle between the hours in question, that's part of the alibi because, if the car's elsewhere, he's elsewhere. And that wasn't claimed by the defense. I gave [the defense] every opportunity to give notice, including pressing the defense [two days ago] [until] 3 [p.m.] when defense counsel said: 'Well, they were en route to Meriden to New Haven [until] 4 p.m.' And I still was going to entertain that type of testimony. But now I think the court can no [longer] accommodate the defense under the totality of the circumstances.

"Also I gave . . . some lenience to allow [the defense] to put in [its] alibi if it was consistent with the investigative report that was given to the state. This is inconsistent. . . . You can't get around, and I'm using your words 'getting around the alibi,' in this way. It's inappropriate; it's improper. If there's a legitimate alibi, you have a duty to put it forward. And I have a duty to put it before the jury."

in accordance with the jury verdict and sentenced the defendant to twenty years incarceration. In sentencing the defendant, the court merged the sentences for each offense in accordance with *State* v. *Chicano*, 216 Conn. 699, 725, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991).

The defendant appealed from the judgment of conviction on the ground that the trial court's exclusion of Rooty's testimony that the Neon was at a different location at the time of the shooting[9] violated his right to present a defense under the sixth and fourteenth amendments to the United States constitution. See *State* v. *Tutson*, supra, 84 Conn. App. 622. The Appellate Court agreed, explaining that the excluded testimony "[did] not place the defendant at the relevant time in a location different from the scene of the crime and so removed therefrom as to render it impossible for him to be the guilty party. In fact, it [did] not facially concern the location of the defendant at the time of the crime." Id., 625. The Appellate Court thus concluded that the testimony could not be characterized as alibi testimony and that the trial court had no authority to exclude it as a sanction for defense counsel's failure to disclose Rooty as an alibi witness. See id. The Appellate Court also concluded that the improper ruling rose to the level of a constitutional violation that was harmful to the defendant, thus warranting reversal of the trial court's judgment and a new trial. Id., 626–27. This certified appeal followed.

I

The state first challenges the Appellate Court's conclusion that Rooty's proposed testimony that she was driving her Neon in the north end of Hartford at the

_____

[9] On appeal to the Appellate Court, the defendant did not raise any issue with respect to the trial court's ruling to exclude Rooty's testimony that she picked the defendant up from Julia's residence at 2 p.m.

time of the alleged offense did not constitute an alibi. The state argues that the defendant was inextricably linked with the Neon because two eyewitnesses identified the Neon as the car involved in the shooting and the defendant as its driver. Consequently, because Rooty's testimony would have suggested that it was physically impossible for the defendant to have been present when the crime was committed, it constituted an alibi.

The defendant responds that the testimony in question did not constitute an alibi because it pertained to the location of the Neon rather than the location of the defendant. He maintains that, as long as *he* was not the one to have claimed that he was in the Neon, the location of the vehicle bears no logical relationship to whether he committed the shooting. The defendant also notes that Practice Book § 40-21 does not require the disclosure of evidence regarding instrumentalities of a crime or the disclosure of all available evidence indicating that he was not the perpetrator. He finally asserts that the purpose of Rooty's testimony was not to establish an alibi but, rather, to discredit the testimony of the two eyewitnesses who implicated him in the crime by showing that, if they were wrong about the identity of the car, they also could have been wrong about the identity of the shooter. We agree with the state.

The issue of whether the proffered testimony constituted an alibi requires this court to interpret the applicable rules of practice and is governed by the same principles that govern statutory interpretation. E.g., *Doe* v. *Connecticut Bar Examining Committee*, 263 Conn. 39, 61, 818 A.2d 14 (2003); see also *State* v. *Pare*, 253 Conn. 611, 622, 755 A.2d 180 (2000) ("principles of statutory construction apply with equal force to Practice Book rules" [internal quotation marks omitted]). Our review is therefore plenary. See, e.g., *State* v. *McCahill*, 265 Conn. 437, 446, 828 A.2d 1235 (2003). "[O]ur fundamental objective [in statutory interpretation] is to ascer-

tain and give effect to the apparent intent of the legislature . . . ." (Internal quotation marks omitted.) *Alexson* v. *Foss*, 276 Conn. 599, 604–605, 887 A.2d 872 (2006).

We begin our analysis by examining the relevant rules of practice concerning alibi testimony. Practice Book § 40-21 provides: "Upon written demand filed by the prosecuting authority stating the time, date, and place at which the alleged offense was committed, the defendant shall file within twenty days, or at such other time as the judicial authority may direct, a written notice of the defendant's intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi." Practice Book § 40-5 further provides that if a party fails to comply with disclosure under § 40-21, the opposing party may seek from the judicial authority an appropriate sanction, such as prohibiting the noncomplying party from introducing the evidence subject to disclosure. Section 40-5 thus places the responsibility for determining whether the evidence to be disclosed constitutes an alibi squarely with the judicial authority rather than the jury.

The rules of practice do not define the term "alibi." See generally Practice Book §§ 40-21 through 40-25. When a term is not statutorily defined, we look to the commonly approved meaning of the word as defined in the dictionary. E.g., *State* v. *Romero*, 269 Conn. 481, 491, 849 A.2d 760 (2004). The word "alibi" is defined in Webster's Third New International Dictionary as "the plea of having been at the time of the commission of an act elsewhere than at the place of commission . . . ." The American Heritage Dictionary of the English Language defines "alibi" as "[a] form of defense

whereby a defendant attempts to prove that he or she was elsewhere when the crime in question was committed." We therefore conclude that an "alibi," as used in Practice Book § 40-21, is a claim by the defendant that he or she was in a place different from the scene of the crime at the time of the alleged offense.[10]

Insofar as inferential testimony may be admitted in support of an alibi, we have noted in at least two prior cases that the location of a vehicle directly involved in a crime may be an integral part of an alibi defense. See *Johnson* v. *Commissioner of Correction*, 222 Conn. 87, 93, 608 A.2d 667 (1992) (concluding that defense counsel not ineffective for presenting alibi defense at defendant's insistence even though habeas court found "untenable" defendant's alibi that he was not in car in which victim was assaulted "because of the strength

[10] Other authorities and jurisdictions have defined an alibi even more precisely to include the physical impossibility of the defendant's presence at the crime scene. See, e.g., 21 Am. Jur. 2d 286, Criminal Law § 221 (1998) ("[w]hile the accused must show that he or she was at another specified location when the crime was committed, there is no minimum or threshold quantum of physical separation necessary for a defense to constitute an alibi, so long as the separation makes it impossible for the defendant to have committed the crime"); 23 C.J.S. 402, Criminal Law § 1113 (1989) (alibi evidence "tends to show the impossibility, or the improbability, of the presence of [the] accused at the time of the commission of the crime"); Black's Law Dictionary (8th Ed. 2004) (defining "alibi" as "[a] defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time"); see also *Wycoff* v. *State,* 382 N.W.2d 462, 472 (Iowa 1986) (alibi asserted to prove not only that defendant was not present, but that "he was at another place so remote or under such circumstances that he could not have been present" [internal quotation marks omitted]); *Locke* v. *State,* 943 P.2d 1090, 1093 (Okla. Crim. App. 1997) (successful assertion of alibi requires that evidence show that, "at the very time of the commission of the crime . . . the accused was at another place so far away or under such circumstances that he could not, with ordinary exertion, have reached the place where the crime was committed" [internal quotation marks omitted]); *Commonwealth* v. *Mikell,* 556 Pa. 509, 517, 729 A.2d 566 (1999) (alibi defense "places the defendant at the relevant time at a different place than the scene [of the crime] and so removed therefrom as to render it impossible for him to be the guilty party" [internal quotation marks omitted]).

of the evidence relating to the identification of the car involved in the crime, including the victim's fingerprint found on its exterior"); *Lombardo* v. *State*, 172 Conn. 385, 386–87, 374 A.2d 1065 (1977) (referring to defendant's alibi that he was "preparing to attend a funeral . . . without an operable car available" at time of illegal drug transaction in which third party removed twenty-four kilograms of marijuana from trunk of car driven by defendant and sold it to undercover officers). This court never has been asked to determine, however, and the rules of practice do not address, whether inferential testimony regarding the defendant's location at the time of the alleged offense properly falls within the definition of an alibi and is subject to disclosure under Practice Book § 40-21. We thus turn for guidance to other jurisdictions that have considered similar provisions.

The Supreme Court of Georgia recently interpreted § 17-16-5 of the Official Code of Georgia,[11] a statutory provision regarding alibi testimony that is identical in all material respects to Practice Book § 40-21. See *Tubbs* v. *State*, 276 Ga. 751, 752–53, 583 S.E.2d 853 (2003). The court interpreted the statute to require not only the disclosure of witnesses who will testify as to the defendant's exact whereabouts at the time that the crime was committed but also the disclosure of witnesses who

---

[11] Section 17-16-5 (a) of the Official Code of Georgia provides: "*Upon written demand by the prosecuting attorney* within ten days after arraignment, or at such time as the court permits, *stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days* of the demand of the prosecuting attorney or ten days prior to trial, whichever is later, *or as otherwise ordered by the court*, upon the prosecuting attorney *a written notice of the defendant's intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names, addresses*, dates of birth, and telephone numbers *of the witnesses*, if known to the defendant, *upon whom the defendant intends to rely to establish such alibi* unless previously supplied." (Emphasis added.) The emphasized language is identical in all material respects to the language in Practice Book § 40-21.

will give inferential testimony regarding the defendant's location. Id. The court concluded: "[A] defendant does not comply with the statute by listing only those witnesses who will testify as to the defendant's location at the specific time of the alleged offense. Instead, the statute prescribes notice in two parts: first, a statement of the alibi defense and, second, a list of witnesses in support thereof. Only the former refers to the particular time of the alleged offense. The latter portion is concerned with witnesses who will testify regarding the alibi defense. . . . Even if the witnesses do not testify that the defendant was at a certain location at the exact time of the offense, their testimony may still support such a finding. In that instance, they do come within the parameters of the statute because they are witnesses upon whom the defendant intends to rely to establish such alibi . . . ." (Citation omitted; internal quotation marks omitted.) Id.

New Jersey has construed a similar statutory provision as applying to "witnesses circumstantially corroborative of alibi. . . . Whether the testimony of the proposed witness shows directly that a defendant was not physically present at the precise time and place of the alleged offense, or does so only inferentially, its purposes and objectives are the same. The difference is the weight and degree of persuasiveness attributed to that testimony by the jury. There is no less reliance by [the] defendant on such testimony nor less need for notice by the [s]tate that it will be offered." *State* v. *Nunn*, 113 N.J. Super. 161, 167–68, 273 A.2d 366 (App. Div. 1971); see also *State* v. *Looper*, 118 S.W.3d 386, 418 (Tenn. Crim. App.) (citing *Nunn*), appeal denied, Docket No. E2001-01550-SC-R11-CD, 2003 Tenn. LEXIS 675 (Tenn. July 7, 2003), cert. denied, 540 U.S. 1060, 124 S. Ct. 836, 157 L. Ed. 2d 717 (2003); *State* v. *Coury*, 697 S.W.2d 373, 379–80 (Tenn. Crim. App. 1985). We agree with those jurisdictions to have considered the

matter that, depending on the circumstances, testimony supporting an inference that the defendant is at a location other than the scene of the crime at the time of the alleged offense may be admitted to establish an alibi, thus requiring disclosure in accordance with the notice provisions set forth in our rules of practice.

Applying this principle in the present case, we conclude that the trial court properly characterized as an alibi Rooty's proposed testimony that she drove her Neon to the north end of Hartford after she dropped the defendant off at Julia's residence between 12:30 and 1 p.m., and that she picked him up at 2 p.m. The state's theory of the case, as set forth in the bill of particulars, was that the defendant was driving a white Dodge Neon at the time of the shooting. Two eyewitnesses later identified Rooty's Neon as the car involved in the shooting and the defendant as its driver. Other evidence likewise established that Rooty's Neon was the vehicle involved in the shooting. This evidence consisted of recent gunshot residue found on the exterior of the vehicle's passenger side door, information that Rooty was the lessee of the vehicle and the fact that Pagan and the police discovered the abandoned Neon approximately twelve hours following the crime in the aftermath of a chase, with its engine still warm and its doors wide open, and the defendant and Washington hiding nearby. The defendant's lack of access to the Neon implies that neither the Neon nor the defendant was present when the crime was committed. In other words, the defendant's location was coextensive with that of the car, and it is immaterial that the defendant could have reached the crime scene by some other means. Accordingly, the Neon and the defendant are not analytically distinct but inextricably linked, and Rooty's testimony that the Neon was in another location when the shooting occurred *necessarily* implied that the defendant was in another location as well. We therefore con-

clude that the trial court properly determined that Rooty's testimony constituted an alibi for purposes of the notice provisions of Practice Book § 40-21.

In light of the foregoing, the defendant's contention that he was not required to disclose evidence regarding the instrumentalities of a crime on which he intended to rely or to disclose all of the available evidence in his possession contradicting the state's case against him has no bearing on the issue before this court because the evidence in question, namely, Rooty's testimony regarding the Neon, constituted an alibi. The defendant's assertion that the location of the Neon is irrelevant unless he is the one to claim that he was driving the vehicle at the time of the shooting is unpersuasive for a similar reason. See *State* v. *Dunne*, 234 Iowa 1185, 1192, 15 N.W.2d 296 (1944) ("[t]he question whether an alibi is claimed is not settled by what a defendant contends his defense is").

To the extent that the defense sought admission of Rooty's testimony for the purpose of discrediting the testimony of the two eyewitnesses and advancing a theory of misidentification, the trial court properly excluded it because any theory of misidentification had to be based on the premise that the defendant was at another location at the time of the alleged offense, which is the classic definition of an alibi. Conversely, when the parties do not dispute that the crime was committed, as in this case, the defense of alibi, if successful, necessarily leads to the conclusion that the defendant was misidentified as the perpetrator. Consequently, because the defendant's theory of misidentification was inseparable from his alibi defense, the admission of Rooty's testimony under a theory of misidentification necessarily would have been in violation of Practice Book § 40-21.

The defendant finally argues that construing the notice of alibi provision to require the defendant, but

not the state, to disclose the whereabouts of an instrumentality of a crime, in this case, Rooty's Neon, violates the principle of reciprocity espoused in *Wardius* v. *Oregon*, 412 U.S. 470, 472, 475, 93 S. Ct. 2208, 37 L. Ed. 2d 82 (1973), and would render Practice Book § 40-21 unconstitutional. The defendant recognizes that Connecticut's notice of alibi rule has been upheld as constitutional because its language places the same duty of disclosure on the defense as on the state. See *State* v. *Villafane*, 171 Conn. 644, 667–68, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977), overruled in part on other grounds by *State* v. *Stepney*, 191 Conn. 233, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). He contends, however, that, under the state's expansive reading of Practice Book § 40-21, the rule did not require the state to disclose its claim that the defendant was in Rooty's Neon at the time that the crime was committed but required the defendant to disclose his claim that he was *not* in her car at that time. The defendant suggests, therefore, that he was compelled to make a greater disclosure than the state and the reciprocal disclosure requirement of *Wardius* was violated. The defendant also contends that, even if § 40-21 can be read to require the defense to disclose the location of the Neon, the state never gave notice that it claimed that the defendant was driving the vehicle when the shooting occurred. This claim has no merit.

In *Wardius*, the United States Supreme Court held that "the Due Process Clause of the Fourteenth Amendment forbids enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants." *Wardius* v. *Oregon*, supra, 412 U.S. 472. In Connecticut, the rules of practice provide for reciprocal discovery rights with respect to a defendant's alibi testimony and have been upheld as constitutional. See *State* v. *Villafane*, supra, 171 Conn. 667–68. This principle is not

violated in the present case, as the defendant contends, because the only disclosure required under Practice Book § 40-21 is a statement as to the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish the alibi. In other words, the defendant was required to provide nothing more than the name and address of Rooty as an alibi witness and the place that he claimed to have been when the crime was committed; he had no obligation to reveal the location of the Neon in the written notice of alibi. Proper notice, however, would have given the state an opportunity to interview Rooty and to determine more precisely what her testimony would have revealed insofar as it established the location of the defendant and the location of the Neon in the north end of Hartford after she dropped the defendant off at Julia's residence. Accordingly, the defendant's claim must fail because it is based on the faulty premise that the trial court's ruling would have required the defendant to disclose the location of Rooty's vehicle in the written notice of his intention to offer an alibi defense.

We finally note that, contrary to the defendant's claim, the state specifically alleged in the bill of particulars that the defendant was driving a 1997 white Dodge Neon when the crime was committed. The defendant therefore cannot argue that the state did not disclose its claim that he was driving a white Neon when the alleged offense took place.

## II

The state next claims that, because the Appellate Court improperly concluded that Rooty's testimony did not constitute an alibi, its corresponding conclusion that the trial court abused its discretion in excluding the proffered testimony also was improper. The defendant

responds that the trial court's exclusion of Rooty's testimony was a mechanistic application of the disclosure rules that denied him his constitutional right to present a defense. We agree with the state.

As a preliminary matter, we set forth the applicable standard of review and the legal principles governing our resolution of this claim. "The sixth amendment does not confer the right to present testimony free from the legitimate demands of the adversary system. . . . The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played. [There is] ample room in that system [for a notice of alibi rule] which is designed to enhance the search for truth in the criminal trial by insuring both the defendant and the [s]tate ample opportunity to investigate certain facts crucial to the determination of guilt or innocence. . . . The notice of alibi rules place reasonable conditions on the presentation of alibi evidence and do not impermissibly restrict a criminal defendant's right to compel attendance of witnesses. . . .

"We recognize, however, as have most courts addressing the issue, that exclusion of alibi witnesses may not be justified in all cases where the defendant has failed to comply with the discovery rules. The trial court must weigh the need for exclusion against the defendant's right to present a defense. . . . The decision is within the sound discretion of the trial court and will turn on the facts of the particular case. Factors which the trial court must consider include: whether the disclosure violation was technical or substantial, the timing of the ultimate disclosure, the reason, if any, for the violation, the degree of prejudice to the parties respectively offering and opposing the evidence, whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance." (Citations omitted; internal quotation

marks omitted.) *State* v. *Boucino*, 199 Conn. 207, 213–14, 506 A.2d 125 (1986).

Practice Book § 40-5 provides in relevant part: "If a party fails to comply with disclosure as required under these rules, the opposing party may move the judicial authority for an appropriate order. The judicial authority hearing such a motion may enter such orders and time limitations as it deems appropriate, including, without limitation . . . (4) [p]rohibiting the non-complying party from introducing specified evidence . . . ." Furthermore, Practice Book § 40-24 provides: "For good cause shown, the judicial authority may grant an exception to any of the requirements of Sections 40-21 through 40-23," which concern the disclosure of the defense of alibi.

We conclude that the trial court did not abuse its discretion in excluding Rooty's testimony as a sanction for noncompliance with the applicable rules of practice. The defendant's notice of alibi named only one person, Julia, as an alibi witness. The investigative report, which the defense also characterized as notice of its intent to present an alibi defense, listed Rooty as a subject to be interviewed but not as the defendant's girlfriend or as a witness on whom the defendant intended to rely to establish an alibi defense. As a result, the investigative report made no reference to the testimony that Rooty would have given as an alibi witness. It was not until approximately eleven months later, after the trial had commenced and the state had presented the testimony of all but one of its witnesses, that the defense suddenly disclosed that its "strongest" alibi witness was Rooty. The defense thus failed to inform the state that Rooty would testify as an alibi witness until midway through the trial.

In addition, the defense gave conflicting and misleading information as to the substance of the proffered

testimony. The original notice disclosing Rooty as an alibi witness, which was untimely filed, disclosed that Rooty would testify that she and the defendant were together between 1:20 and 3 or 4 p.m. on the day of the shooting and that, during that time, they were en route to and from Meriden and New Haven to pick up or drop off her child. Thereafter, when the court, after much deliberation, agreed to admit Rooty's alibi testimony on the condition that the state would have an opportunity to interview her first, defense counsel declared that Rooty would *not* testify as an alibi witness. She thus appeared as a regular witness. Only after Rooty testified that she had dropped the defendant off at Julia's residence between 12:30 and 1 p.m. on the day of the shooting did the state express concern that she was about to give alibi testimony. Although defense counsel explained that she had learned only recently, after locating Rooty, that Rooty was not with the defendant at the time of the shooting, which accounted for the change in her testimony from that which was described in the written notice of alibi, she also conceded that she was trying to "get around the alibi issue problem" by offering testimony pertaining to the vehicle instead of to the defendant.

Considering the untimeliness of the defendant's original disclosure that Rooty would testify as an alibi witness and the radical change in the substance of her testimony after defense counsel assured the court that Rooty would not testify as an alibi witness, we conclude that the trial court's exclusion of Rooty's testimony regarding events that transpired after she dropped the defendant off at Julia's residence was an appropriate sanction under Practice Book § 40-21. See *State* v. *Sanchez*, 200 Conn. 721, 729–32, 513 A.2d 794 (1986) (court properly excluded alibi testimony when defendant sought to add witness after state and defendant had rested their cases, defendant previously had stated that

witness would not be called and witness was known to defendant throughout proceedings); *State* v. *Bouchino*, 199 Conn. 207, 210–11, 216, 506 A.2d 125 (1986) (court properly excluded alibi testimony when notice of alibi was filed more than two years after state filed its demand for notice and after commencement of trial); *State* v. *Horne*, 19 Conn. App. 111, 132, 562 A.2d 43 (1989) (court properly excluded alibi testimony when witness was disclosed almost three months after demand for notice, trial had commenced and state was concluding its case), rev'd on other grounds, 215 Conn. 538, 577 A.2d 694 (1990).

The defendant maintains that, even if he violated the disclosure rule, the violation was not wilful and the alibi was not recently fabricated, both of which are commonly cited reasons for excluding such testimony. See *Taylor* v. *Illinois*, 484 U.S. 400, 411–12, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) (alibi notice provisions minimize "risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony"). The defendant explains that the inability to locate Rooty earlier in the proceedings explains why the proffered testimony did not conform to the written notice of alibi, which was prepared and submitted to the court before she was located. He further explains that, despite good faith efforts, defense counsel was unable to locate Rooty until the middle of the trial, and defense counsel's first opportunity to interview her was the night before she testified. The defendant finally contends that he had a good faith belief that testimony regarding the location of Rooty's car was not alibi evidence and that the court itself recognized that whether it constituted alibi evidence was an issue about which "reasonable people could differ." (Internal quotation marks omitted.) He accordingly asserts that the trial court's sanction was excessive and bore no reasonable relationship to the legitimate purpose of the notice pro-

visions contained in the rules of practice. We are not persuaded. Even if we assume, without deciding, that the violation was not wilful and that the testimony was not fabricated;[12] see *Taylor* v. *Illinois*, supra, 411–12; the defendant's failure to disclose the testimony in a more timely manner was unduly prejudicial to the state.

"[T]he ends of justice will best be served by a system . . . [that] gives both parties the maximum possible amount of information with which to prepare their cases and thereby reduces the possibility of surprise at trial." (Internal quotation marks omitted.) *State* v. *Bronson*, 258 Conn. 42, 54, 779 A.2d 95 (2001). "The

[12] We note that this assumption requires a rather significant leap of faith in light of the fact that the final "version" of Rooty's proffered testimony, namely, that she dropped the defendant off at Julia's residence between 12:30 and 1 p.m. and did not pick him up until 2 p.m., represented a complete reversal from the alibi testimony initially proffered by the defense that she waited for the defendant outside Julia's residence in her Neon while he visited with Terrell and Tyrone, that he left Julia's residence around 1:15 p.m., and that he accompanied her when she drove to Meriden and New Haven to pick up her child. Moreover, the original version of Rooty's testimony was consistent with the investigative report, which the defendant had described as written notice of his alibi defense. When defense counsel later indicated that Rooty would not be giving testimony consistent with the report, the court observed that the defense seemed to be "playing a game . . . ." Defense counsel ultimately conceded that she was trying to "get around the alibi issue problem" by offering Rooty's changed testimony regarding the location of the Neon in the north end of Hartford at the time the crime was committed. It is also notable that neither version of Rooty's proffered testimony was consistent with her statement to Detective Weaver shortly after the shooting that she had given the defendant permission to use the Neon on the morning of the shooting and had no knowledge regarding its whereabouts until Weaver contacted her in the aftermath of the crime. Moreover, Rooty's proffered testimony would have been inconsistent with the actual testimony of Julia, one of the defendant's key witnesses, that the defendant left her residence minutes before the shooting to go with Rooty to pick up her child in Meriden and New Haven. The serial submission of various alibis before and during the trial strongly suggests fabrication. The defendant, who was arrested within hours of the alleged crime, in all likelihood knew where he was in the preceding hours and knew who, if anyone, would be able to verify his alibi. Thus, the submission to the court of conflicting alibis indicates that Rooty's testimony would not have been truthful.

purpose of criminal discovery is to prevent surprise and to afford the parties a reasonable opportunity to prepare for trial." (Internal quotation marks omitted.) *State* v. *Wilson F.*, 77 Conn. App. 405, 419, 823 A.2d 406, cert. denied, 265 Conn. 905, 831 A.2d 254 (2003).

Rooty's belated alibi testimony was exactly the type of surprise that the rules of discovery were designed to prevent. The surprise was especially dramatic in the present case because the defense had assured the state only a short time earlier that Rooty would not be giving alibi testimony. In addition, disclosure of the alibi testimony so late in the proceedings prevented the state from interviewing and investigating the witness, her testimony and other potential witnesses who might have had knowledge corroborating whether Rooty picked up or dropped off her child in Meriden or New Haven at the time in question. This in turn potentially affected the state's presentation of the evidence and its overall trial strategy.

Although the untimely disclosure of alibi testimony in certain cases may be cured by a postponement or continuance; see Practice Book § 40-5; this was not an option in the present case because the trial had commenced and the state already had concluded its case-in-chief. Thus, any potential damage to the state's case caused by admission of the proffered testimony would have been, for all intents and purposes, irreversible and unduly prejudicial. Moreover, we have stated that the inability to locate a potential witness does not diminish a party's obligation to identify that person under the applicable rules of practice. *State* v. *Sanchez*, supra, 200 Conn. 731 n.5; see Practice Book § 40-23. If the defendant diligently had been trying to locate Rooty and considered her to be one of his key witnesses, as he claims on appeal, defense counsel could have, and should have, requested a postponement or continuance for the purpose of determining her whereabouts and

obtaining her testimony. We therefore conclude that the trial court did not abuse its discretion in excluding the proffered testimony as a sanction for the defendant's noncompliance with the applicable rules of practice.

## III

The defendant claims, as an alternative ground for affirming the Appellate Court's judgment,[13] that he was denied his constitutional right to present a defense when the trial court excluded his statement to Julia, made shortly before the shooting, that he had intended to go to Meriden. The defense offered this statement under § 8-3 (4) of the Connecticut Code of Evidence[14] to prove that the defendant was en route to Meriden and could not have been at the crime scene when the

[13] Practice Book § 84-11 provides in relevant part: "(a) Upon the granting of certification, the appellee may present for review alternative grounds upon which the judgment may be affirmed provided those grounds were raised and briefed in the appellate court. . . ." The defendant sought permission, on December 13, 2004, to file an untimely statement of an alternative ground for affirming the Appellate Court's judgment, which this court granted on January 3, 2005. The defendant claimed, as an alternative ground for affirmance, that "[t]he trial court denied [him] his constitutional right to present a defense when it excluded his statement made shortly before the shooting that he intended to drive to Meriden [which] was admissible as state of mind evidence to show his [then-existing] intention to do a future act and [which] would have supported his alibi that he was not in the south end of Hartford at the time of the shooting." Although this issue was addressed by the parties in their Appellate Court briefs, that court declined to address the issue in light of its reversal of the trial court's judgment on another ground. See *State* v. *Tutson*, supra, 84 Conn. App. 611 n.1.

[14] Section 8-3 of the Connecticut Code of Evidence provides in relevant part: "The following [is] not excluded by the hearsay rule, even though the declarant is available as a witness:

* * *

"(4) Statement of then-existing mental or emotional condition. A statement of the declarant's then-existing mental or emotional condition, including a statement indicating a present intention to do a particular act in the immediate future, provided that the statement is a natural expression of the condition and is not a statement of memory or belief to prove the fact remembered or believed. . . ."

alleged offense occurred. The state responds that the trial court properly excluded the statement because it was elicited for the purpose of establishing the defendant's alibi and not exclusively to establish his state of mind. We agree with the state that the trial court properly excluded the defendant's statement to Julia that he intended to go to Meriden.

Julia, who appeared as a witness for the defense, testified that the defendant had left her residence at approximately 1:10 or 1:15 p.m. on the day of the shooting. She also was about to testify as to what the defendant said to her as he was preparing to leave when the state objected on hearsay grounds. Outside the jury's presence, defense counsel asserted that the testimony was admissible under the state of mind exception to the hearsay rule. The witness then informed the court that the defendant had told her that he had to go to Meriden with his girlfriend to drop off or to pick up her children and that he planned on coming back later after he did some "running around . . . ." The court responded that, despite defense counsel's assertion to the contrary, it appeared that the disputed testimony was being offered for its truth: "It's intent to do a future act. . . . It's offered for the truth contained therein, that . . . he's going to Meriden." The court also observed that, even if the testimony was being offered solely for the purpose of indicating the defendant's state of mind, it would have no relevance in the absence of evidence that the defendant went to New Haven or Meriden after he left Julia's residence. The court thus sustained the state's objection because no evidence to that effect had been admitted, and because defense counsel had told the court earlier that day that Rooty would not be giving alibi testimony that she was with the defendant after she dropped him off at Julia's residence. Thereafter, Julia testified that, upon leaving her residence, the defendant told her that his girlfriend was

waiting outside in a small white car. She also testified that she had seen a woman and a child in a small white car parked outside her residence when she had returned from grocery shopping a few minutes earlier.

We begin with the applicable principles of law. "The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . .

"A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . Thus, our law is clear that a defendant may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 850–51, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not

worthy or safe to be admitted in the proof of the latter." (Internal quotation marks omitted.) *State* v. *Saunders*, 267 Conn. 363, 383, 838 A.2d 186, cert. denied, 541 U.S. 1036, 124 S. Ct. 2113, 158 L. Ed. 2d 722 (2004); see also Conn. Code Evid. § 4-1.

"Finally, [i]t is well established that a trial court has broad discretion in ruling on evidentiary matters, including matters related to relevancy. . . . Accordingly, the trial court's ruling is entitled to every reasonable presumption in its favor . . . and we will disturb the ruling only if the defendant can demonstrate a clear abuse of the court's discretion." (Internal quotation marks omitted.) *State* v. *Carpenter*, supra, 275 Conn. 851.

With respect to the principles that govern application of the hearsay rule, "[a]n out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule." (Citation omitted; internal quotation marks omitted.) *State* v. *Aaron L.*, 272 Conn. 798, 812, 865 A.2d 1135 (2005); see also Conn. Code Evid. § 8-2. Section 8-3 (4) of the Connecticut Code of Evidence, however, recognizes an exception for "[a] statement of the declarant's then-existing mental or emotional condition, including a statement indicating a present intention to do a particular act in the immediate future . . . ." Thus, a declaration indicating an "intention to do a particular act in the immediate future, *made in apparent good faith and not for self-serving purposes*, [is] admissible as an exception to the hearsay rule, to prove that the act was in fact performed." (Emphasis added.) *State* v. *Santangelo*, 205 Conn. 578, 591, 534 A.2d 1175 (1987); accord *State* v. *Journey*, 115 Conn. 344, 351, 161 A. 515 (1932). Conversely, a statement by the accused that he told another person shortly before the crime that he intended to go to a

place distant from the scene of the crime was held inadmissible as a self-serving alibi. See *State* v. *Goldberger*, 118 Conn. 444, 455, 177 A. 216 (1934).

In the present case, the defendant claims that his statement to Julia was admissible because it was evidence of his intention to go to Meriden and, therefore, admissible as proof that he, in fact, went to Meriden during the time of the commission of the crime. As such, the only relevance of this testimony would have been as an alibi that he was traveling to Meriden with Rooty when the crime was committed in Hartford. Applying the foregoing principles, we conclude that the court properly excluded the defendant's statement on hearsay grounds because it was a self-serving alibi that was not made in good faith. See id.

Defense counsel originally informed the court that Rooty would give alibi testimony that, after the defendant left Julia's residence, she and the defendant drove in her Neon to Meriden for the purpose of picking up her children. Immediately prior to Julia's testimony, however, defense counsel informed the court, outside the presence of the jury, that Rooty would *not* be giving the anticipated alibi testimony because she had told defense counsel in an interview the previous evening that she was not with the defendant at the time of the shooting, after she dropped him off at Julia's residence. Furthermore, the defendant had unsuccessfully sought to have Rooty testify that she was driving her Neon in the north end of Hartford at the time of the crime. In light of these developments, subsequent testimony that the defendant told Julia that he intended to go to Meriden, implicitly with Rooty in her Neon, could not have been offered in good faith or for a purpose that was not self-serving. Thus, the defendant's statement to Julia did not properly come within the hearsay exception for statements of then-existing state of mind. Accordingly,

the trial court properly excluded Julia's testimony regarding the defendant's statement.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to consider the state's sentencing claim and the defendant's claim regarding instructional impropriety.[15]

In this opinion the other justices concurred.

---

[15] The defendant claimed in the Appellate Court that the trial court's instructions impermissibly had allowed the jury to find him guilty of attempt to commit murder under the doctrine of transferred intent. See *State* v. *Tutson*, supra, 84 Conn. App. 611 n.2. The Appellate Court did not address that issue in light of its conclusion that a new trial was warranted on other grounds. Id.