## STATE OF CONNECTICUT *v.* MARTIN GRAY
### (AC 29164)

Bishop, Lavine and Peters, Js.

---

Argued October 14, 2010—officially released February 15, 2011

*G. Douglas Nash*, special public defender, for the appellant (defendant).

law. That argument fails because the evidence demonstrated that M was secured using only a lap belt.

*Rocco A. Chiarenza,* special deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, *Beth Baran,* senior assistant state's attorney, and *James G. Clark,* former senior assistant state's attorney, for the appellee (state).

*Opinion*

PETERS, J. General Statutes § 54-86k (a) provides, in relevant part, that "[i]n any criminal proceeding, DNA (deoxyribonucleic acid) testing shall be deemed to be a reliable scientific technique and the evidence of a DNA profile comparison may be admitted to prove or disprove the identity of any person." In *State* v. *Clemons,* 168 Conn. 395, 403, 363 A.2d 33, cert. denied, 423 U.S. 855, 96 S. Ct. 104, 46 L. Ed. 2d 80 (1975), our Supreme Court held that an indigent defendant is entitled to the assistance of a state funded expert witness to counter expert testimony presented by the state, such as DNA testing, that is derived from new scientific technology. The principal issue in this appeal is whether the trial court abused its discretion in refusing a last-minute request by a criminal defendant to have an incriminating DNA test reexamined by a testing agency of the defendant's choice. We affirm the ruling of the trial court and its subsequent judgment finding the defendant guilty of the crimes with which he was charged.

In a two count information filed May 8, 2007, the state charged the defendant, Martin Gray, with having engaged in sexual intercourse with a person under thirteen years of age in violation of General Statutes § 53a-70 (a) (2)[1] and with having had intimate sexual contact

---

[1] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

with a child under the age of sixteen in violation of General Statutes (Rev. to 2003) § 53-21 (2).[2] After accepting the jury's verdict finding him guilty of these crimes, the trial court imposed a total effective sentence of forty-five years of incarceration, execution suspended after thirty-five years, followed by fifteen years of probation. The defendant has appealed.

The jury reasonably could have found the following facts. The defendant became a member of the victim's household when she was six years old.[3] Six years later, when the victim began to occupy a bedroom of her own, the defendant repeatedly engaged in sexual intercourse with her. His misconduct came to light when the victim became pregnant and had a baby. The state's DNA testing of the victim, the baby and the defendant showed a high statistical probability that the defendant was the baby's father.

To counter this incriminating evidence, the defendant maintains on appeal, as he argued at trial, that the trial court (1) improperly deprived him of the opportunity for an independent retest of the state's inculpatory DNA test and (2) misinstructed the jury on the relationship between intoxication and criminal liability. We are not persuaded by either claim.

---

[2] General Statutes (Rev. to 2003) § 53-21 (a) provides in relevant part: "Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of . . . a class B felony for a violation of subdivision (2) of this subsection."

We note that the conduct that gave rise to the risk of injury charge was alleged to have occurred between November 1, 2004, and August 2, 2005. In 2007, § 53-21 was amended. See Public Acts 2007, No. 07-143, § 4. Because the relevant 2003 and 2005 revisions of § 53-21 are identical, for convenience, we refer to the 2003 revision.

[3] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to indentify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

I

## DNA RETESTING

The defendant's principal argument on appeal is that his conviction should be set aside because he was deprived of an opportunity to have an independent laboratory examine the DNA swabs that, according to the state's experts, demonstrated that he was the father of the victim's baby. In February, 2006, buccal swabs[4] from the victim, her baby and the defendant were submitted to the state laboratory for DNA paternity testing. The laboratory reported that the results were "consistent with [the defendant] being the father of [the victim's baby]." At trial, the state's expert witness, although acknowledging that the test is a statistical comparison that cannot establish paternity definitively, opined that the probability of the defendant being the father was high.

In view of the incriminating nature of this DNA evidence, on May 1, 2007, in advance of the trial, the defendant filed a motion, pursuant to Practice Book (2007) § 40-11,[5] in which he sought a court order requiring the

[4] A buccal swab is a cotton-tipped device used to collect cheek cells from the inside of an individual's mouth.

[5] Practice Book (2007) § 40-11 (a) provides in relevant part: "Upon written request by a defendant filed in accordance with Section 41-5 and without requiring any order of the judicial authority, the prosecuting authority, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose in writing the existence of and allow the defendant in accordance with Section 40-7, to . . . have reasonable tests made on any of the following items . . .

"(4) [a]ny reports or statements of experts made in connection with the offense charged including results of physical and mental examinations and of scientific tests, experiments or comparisons which are material to the preparation of the defense or are intended for use by the prosecuting authority as evidence in chief at the trial . . . ."

In footnote 17 of its appellate brief, the state points out that it would have been more appropriate for the defendant, who concededly had received the state laboratory's DNA report, to have cited Practice Book § 40-11 (a) (2), rather than Practice Book § 40-11 (a) (4), as the basis for his request for access to the buccal swabs. The record makes it clear, however, that

state to arrange for the DNA buccal swabs to be sent for retesting to Orchid Cellmark, a laboratory in Dayton, Ohio. The defendant's counsel explained to the court that, despite intensive efforts to move forward, she had only recently been able to identify this laboratory as a qualified testing resource.[6] Expressing skepticism that such a test could be conducted in the five day period before the scheduled date for the commencement of the defendant's trial, the state opposed the motion. It emphasized that it had disclosed the DNA results to the defendant many months earlier, on October 4, 2006. The court, *Damiani, J.*, observed, as well, that on February 14, 2007, the defendant had been granted a continuance for the very purpose of enabling his counsel to consult with her own DNA experts. Although the defendant disclaimed any intention to ask for a further continuance and described a plan for an expedited processing of the DNA samples once they had been received from the state, the court denied the defendant's motion.[7]

## A

Focusing on the unique importance of DNA testing in the determination of the defendant's culpability in this case, the defendant asks us to review the denial of his motion for an independent examination of the DNA samples in accordance with the plenary standard of review that governs evidentiary claims that have significant constitutional implications. He relies on recent case law in which our Supreme Court has undertaken a plenary review of arguably suggestive pretrial

at the hearing on the defendant's motion for further DNA testing, there was no confusion about the nature of the defendant's request.

[6] In light of the frequency of criminal cases involving some kind of DNA evidence, it is notable that it is apparently the responsibility of an individual public defender to identify a laboratory to conduct a DNA retest.

[7] The defendant renewed his motion at his trial before the court, *Licari, J.*, but the motion was again denied.

identification procedures; *State* v. *Marquez*, 291 Conn. 122, 137–38, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009); and of the materiality of undisclosed exculpatory evidence. *State* v. *Ortiz*, 280 Conn. 686, 721–22, 911 A.2d 1055 (2006).

The state reminds us, however, that, our Supreme Court's review of the propriety of sanctions for violations of discovery rules consistently has emphasized the discretion of the trial court to "weigh the need for exclusion against the defendant's right to present a defense." (Internal quotation marks omitted.) *State* v. *Tutson*, 278 Conn. 715, 740, 899 A.2d 598 (2006), quoting *State* v. *Boucino*, 199 Conn. 207, 214, 506 A.2d 125 (1986). In light of these precedents, we agree with the state that we may reverse the trial court's denial of the defendant's request for independent retesting of the DNA samples only if we are persuaded that the court's ruling was an abuse of its discretion.

B

In support of the defendant's contention that the denial of an opportunity for an independent retest was an abuse of the court's discretion, he argues that (1) it would not have been burdensome for the state to challenge the results of a DNA retest, even if these results had been delayed, because such a retest would have been conducted in accordance with standard scientific protocols with which the state had demonstrable familiarity, (2) defense counsel's delay in identifying a testing authority was due not to negligence but to administrative delay in the assignment of counsel to represent the defendant and to the difficulty of identifying a laboratory to conduct the DNA retest, (3) the absence of an independent DNA retest would impair defense counsel's ability to conduct a searching cross-examination of the state's DNA evidence and (4) any

delay occasioned by a belated return of the DNA samples after the retest would not have delayed the trial because jury selection had not yet begun.

The state relies, as it did in the trial court, on the fact that the defendant's motion was untimely in light of the ten weeks that had elapsed after the continuance that had been granted for the specific purpose of enabling the defense to consult a DNA expert. We are not persuaded by the state's additional suggestion that, to justify a request for a DNA retest, the defendant was required to anticipate the evidence that such a retest would have disclosed. The state was entitled, however, to question the accuracy of the defendant's representation that an out-of-state DNA retest could be completed in the five day time interval between the hearing on the motion and the scheduled commencement of the defendant's trial.

On the record before us, the defendant's ten week delay in asking for a retest, combined with the imminence of the commencement of the defendant's trial, provided ample factual support for the court's decision to deny the defendant's motion. We therefore agree with the state that the court's ruling was not an abuse of its discretion.

## II

### JURY INSTRUCTIONS

The defendant's alternate claim on appeal is a challenge to the propriety of the court's jury instructions relating to his denial of having intentionally engaged in intercourse with the victim. Our standard of review for a claim of instructional impropriety is well established. "[I]individual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge . . . . The pertinent test is whether the charge, read in its entirety, fairly presents

the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Rodriguez-Roman,* 297 Conn. 66, 89, 3 A.3d 783 (2010).

The defendant's theory of the case was that he often drank alcohol to excess and took illegal drugs and that, as a result, he often would fall into a deep sleep that resembled a blackout. Because he could not recall anything that had occurred while he had been asleep, he hypothesized that his intercourse with the victim must have resulted from her actions and not his own. Although he conceded that voluntary intoxication was not a defense to the crimes with which he was charged, he argued, in reliance on *State* v. *Pierson,* 201 Conn. 211, 216, 514 A.2d 724 (1986), on appeal after remand, 208 Conn. 683, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989), that because his inebriation rendered him unconscious, his conduct, like the conduct of a person under hypnosis, had not been voluntary and, therefore, could not properly be found to have been criminal misbehavior.

In accordance with the defendant's requested jury instruction with respect to intoxication, the court informed the jury of the defendant's contention that his intoxication, and his resultant unconsciousness, disabled him from engaging in wilful misconduct. The

defendant concedes that the instruction accurately presented his theory of the case to the jury.

However, at the request of the state, and over the objection of the defendant, the court also instructed the jury that both of the crimes with which he was charged were "general intent crimes. . . . Such acts must be voluntary or purposeful and not accidental or inadvertent or unconsciously done. There is no requirement that the defendant act with a criminal purpose. A voluntary act is defined as proceeding from the will or from one's own choice or consent or done by design or intention. Involuntary is defined as the contrary to our own choice. Voluntary bodily movements as used in this instruction on general intent have nothing to do with memory. The question is whether the bodily movements are voluntary or involuntary, not whether the actor has a conscious memory of them. Also, the voluntary ingestion of alcohol or illegal drugs is no defense to the crimes charged herein."[8]

The defendant maintains that the court's charge on general intent was misleading because the evidence of intoxication that he had presented did not and could not explain how the intercourse had occurred and had not been proffered by the defendant as an excuse or defense. In response, the state argues, as it did at trial, that, in light of the totality of the evidence before the jury and the arguments of the parties, the court's instructions had to provide guidance to the jury on the complex interaction between intoxication, general

---

[8] Without objection, the court also instructed the jury as follows: "A person's intent may be proven by direct or circumstantial evidence. No person is able to testify that he looked into another's mind and saw there a particular intent. The only way a jury can determine a person's—what a person's intention was at any given time, aside from that person's own testimony is by circumstantial evidence. You may or may not believe that testimony according to whether or not you find it worthy of belief." The defendant has not challenged the validity of this instruction.

intent and voluntary acts presented by the record. The defendant had himself presented the issue of his intoxication to the jury. Even if the jury believed the defendant's testimony that, because of his abuse of alcohol and drugs, he did not recall having engaged in sexual intercourse with the victim, it might also have believed the victim's testimony that the defendant had entered her room at night and there had sexually assaulted her. Without appropriate instructions, the jury might not have understood that the defendant's failure to *recall* his conduct did not establish that his conduct was *involuntary*.

We agree, therefore, with the state that, on this record, it was appropriate for the court to instruct the jury on the relationship between intoxication and general intent and of the relationship between intoxication and the state's burden of proving that the defendant had engaged in the acts with which he was charged. Indeed, *State* v. *Pierson*, supra, 201 Conn. 216, on which the defendant relies, supports the state's position because it holds that, in the *absence* of evidence of lack of the requisite mental capacity, a court need not charge on general intent. Id., 218. By contrast, in this case, once the defendant introduced such evidence at the trial, the state was entitled to request the charge on general intent that the court gave the jury.

The judgment is affirmed.

In this opinion the other judges concurred.