# STATE OF CONNECTICUT *v.* TRENDEL TUTSON
## (AC 24066)

Flynn, Bishop and McLachlan, Js.

Argued February 24—officially released August 24, 2004

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Michele C. Lukban*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, *Warren Maxwell*, former senior assistant state's attorney, and *Roseanne Wagner*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. In this criminal appeal, the defendant, Trendel Tutson, challenges the validity of his conviction of attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a and assault in the first degree in violation of General Statutes § 53a-59 (a) (5). His principal claim is that two of the court's evidentiary rulings deprived him of his right to present a defense as secured by the sixth and fourteenth amendments to the United States constitution.[1] We reverse the judgment of the trial court and remand the case for a new trial.[2]

---

[1] The defendant raises two arguments in support of his claim that the court's exclusion of evidence sullied his constitutional guarantees. In his view, he is entitled to a new trial because the court improperly (1) excluded, as a sanction, testimony that, if credited, refuted the state's theory of the case and called into question the credibility of the state's only eyewitnesses and (2) precluded, as hearsay, an out-of-court statement of the defendant that supported his alibi defense and concerned his present intention to do a future act. Our resolution of the defendant's first issue requires that we reverse the judgment of the court and order a new trial. As such, we decline to address the defendant's second evidentiary issue at this juncture as it may not arise again during retrial. We do note, however, that § 8-3 (4) of our code of evidence appears to support the defendant's claim.

In addition, in its brief, the state raised a claim that the court improperly merged the defendant's convictions. Assuming, *arguendo*, that we may properly review this claim, we need not reach it for the reasons stated.

[2] The defendant also claims that he was deprived of his constitutional right to due process because the court's charge to the jury impermissibly allowed him to be convicted of attempt to commit murder under the doctrine of transferred intent. Because we conclude that a new trial is warranted on the basis of the defendant's first claim, we need not reach that issue.

We begin by recounting the relevant facts. In that exercise, we paint with a broad brush, reserving more extensive detail for our ensuing discussion of the defendant's specific claims.

The chronological narrative begins on March 26, 2001, between 1 and 1:30 p.m., at which time Ernesto Molina was driving a 1992 red Volkswagen Jetta on Bond Street in Hartford, looking to buy marijuana. Molina was joined by two passengers, Jorge Pagan, Molina's best friend, who sat in the front passenger seat, and Michael Alvarado, who sat in a backseat. As the vehicle traveled on Bond Street, Molina and Pagan noticed a small white car traveling toward them in the opposing lane. They also noticed that there was a passenger in the front seat. As the cars passed, Molina and Pagan saw the face of the driver of the white car.

After the vehicles passed, the white car turned around and, with increasing speed, began following the red Jetta on Bond Street. Molina and Pagan noticed this and became concerned. In an attempt to elude the car, Molina increased his speed to eighty-five to ninety-five miles per hour and drove through stop signs and traffic lights. Molina ultimately turned onto Brownell Avenue and the white car did the same. As the cars were traveling at fifty-five miles per hour, Molina looked in his rearview mirror and saw a long black pole, which he thought was a rifle, come out of the driver's side window of the white car and turn in the direction of the Jetta. Molina then heard a noise and felt something strike the

In addition, in his brief, the defendant includes a statement that he is entitled to a new probation revocation hearing on the basis of his claimed improprieties. Because the defendant merely sets forth that conclusion without argument, we decline to address it. See *Ward* v. *Greene*, 267 Conn. 539, 546, 839 A.2d 1259 (2004) (" '[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly.' ").

back of his head. A large caliber bullet had pierced the back of the Jetta and traveled through the vehicle's trunk and passenger compartment. A fragment of that bullet lodged in the back of Molina's head. Although injured, Molina kept driving, turning right onto Broad Street and continuing to Hartford Hospital. The white car did not follow the Jetta, turning left onto Broad Street instead.

At the hospital, the police immediately were notified of the incident. They arrived at the hospital shortly thereafter and briefly spoke with Molina, Pagan and Alvarado regarding the shooting. The police also conducted a formal interview of Pagan at the police station during which Pagan described the driver and passenger of the white car.

Approximately one hour after arriving at the hospital, the police were contacted by the security department from the Learning Corridor (Corridor). The police were told that a member of the Corridor's security personnel was walking to lunch between 1 and 1:30 p.m., when he heard what sounded like a gunshot resonating from Brownell Avenue. The police also were notified that this security officer searched Brownell Avenue after he learned about the shooting and recovered a twelve gauge shotgun shell from the north side of the street. The police ultimately took the shell into their possession. At that time, it was neither dirty nor rusty and did not appear to have been on the street for a long time. The shell, however, was never tested for fingerprints. The police also took a videotape from the Corridor's exterior surveillance camera. That tape revealed that two vehicles, one red, one white, were on Brownell Avenue and that the red vehicle turned right onto Broad Street while the white vehicle turned left. Neither gunfire nor the make of the vehicles could be discerned from the video. In addition, the video was time-stamped

in a manner that made it unclear that the events depicted actually occurred on March 26, 2001.

Approximately twelve hours after the shooting, at roughly 2 a.m. on March 27, 2001, Pagan, while driving to a gas station to buy a beverage, observed that he was being followed by the defendant in a white Dodge Neon (Neon). Pagan immediately notified police officers that the vehicle that had been involved in the earlier shooting was following him. The police located the Neon and pursued it, but it fled, turning its headlights off in the process. Shortly thereafter, the police located the vehicle in the rear yard of 51 Whitmore Street. The vehicle appeared abandoned; the engine was not running, although it was still warm, and the doors were wide open. A short distance away, the police found the defendant and Philip Washington hiding beneath some cars. Thereafter, the police brought Pagan to the scene where he positively identified the defendant as the driver of the Neon in the earlier shooting and Washington as its passenger.

The police subsequently discovered that Rooty Thomas, who lived in Meriden, was the lessee of the Neon. Once contacted, Rooty Thomas gave the police permission to search the vehicle.

The police performed gunshot residue tests on the hands of the defendant and Washington as well as on the exterior and interior surfaces of the driver's and passenger's doors of the Neon. These tests disclosed lead particles on the palm of the defendant's left hand as well as on the back of his right hand. They further revealed the presence of lead, barium and antimony on the palm of Washington's left hand and lead particles on the exterior of the vehicle's passenger door.

On April 5, 2001, Molina identified the defendant from a photographic array shown to him by the Hartford

police, and on March 8, 2002, Pagan did the same. No weapon was ever recovered.

Trial of this matter began on March 11, 2002. The state alleged that the defendant was guilty of criminal attempt to commit murder and assault in the first degree as either a principal or an accessory.[3] The defendant's theory of the case was that the eyewitnesses misidentified him as the perpetrator of the crime because, at the relevant time, he was at a location other than the scene of the crime and, therefore, he could not have committed it.

In support of its case, the state offered the testimony of two eyewitnesses. The first was Molina who testified, inter alia, that he was positive that the defendant was the driver of the Neon during the shooting. He also identified Rooty Thomas' leased Neon as the vehicle involved in the incident, and he identified the defendant as its driver.

The second eyewitness offered by the state was Pagan. Pagan testified that the car involved in the shooting was a white Dodge Neon and that he recognized it and the defendant as its driver from his previous observations of the defendant and the Neon in his neighborhood. He also said he recognized the passenger in the Neon, although he did not know his name. Pagan further stated that he initiated a conversation with the defendant on March 4, 2002, in which the defendant told him that he "had no beef with" him, that he wanted Pagan to help him, and that he wanted Pagan to apologize to Molina for him. Finally, he testified that he had never had any problems with the defendant prior to the

[3] Specifically, the state claimed that "the defendant either pointed a shotgun through the driver's window of the Dodge Neon and fired a shot at the Volkswagon causing the injuries complained of . . . or assisted Philip Washington who fired the shotgun through the passenger's window, by driving the Neon and engaging it in pursuit of the Volkswagon . . . ."

incident. Pagan also provided an in-court identification of the defendant as the driver of the Neon.

During cross-examination, defense counsel brought out an inconsistency in Pagan's testimony. Although Pagan's statement to the police indicated that he saw the passenger side window of the Neon down during the chase, at trial he testified that he saw the driver's side window down. In an effort to explain himself, Pagan stated that he never said that to the police. Upon reading his statement, he testified that he was mistaken and that the driver's side window was down. Pagan then testified that "[a]t the time . . . I wasn't really thinking about—I didn't even want to do the statement" and, later, that his statement was right the whole time but that sometimes he can get confused.

Defense counsel also elicited testimony from Pagan that he had discussed the identification of the driver of the Neon with Molina after March 26, 2001. Defense counsel elicited that testimony in an attempt to show that Pagan influenced Molina's memory of the events. Finally, Pagan testified that he had a criminal case pending in Hartford.

Detective Andrew Weaver, the officer in charge of the investigation, also testified for the state. According to Weaver, the bullet hole in the Jetta was consistent with a "shotgun round" also classified as "a hunting slug or a one ounce deer-type slug." Weaver also testified that the suspect vehicle was described as a "Dodge Neon white in color" and that a lead fragment was recovered from the Jetta which was consistent with twelve gauge "shotgun slug ammunition."

On cross-examination, Weaver testified that Molina's statement to the police only described the occupants of the Neon as "two black males" and that he could not remember if Molina identified the vehicle as a white Dodge Neon.

The state also offered as evidence the expert testimony of Fung Kwok, a criminalist at the state forensic laboratory. Kwok's testimony concerned the results of the gunshot residue tests performed on the Neon, the defendant and Washington. Kwok stated that given the absence of barium and antimony in the results of the testing done on the defendant and the Neon, it was 50 percent conclusive that the residue found was gunshot residue, but testing was 100 percent conclusive that the residue found on Washington was from a gunshot. Kwok further stated that, in his opinion, that was not a positive finding that the defendant fired a gun, but it was a positive finding that Washington fired a gun.

During cross-examination, Kwok acknowledged that the defendant could have gotten lead on his hands from a number of activities because lead is "very, very common in the environment" and is found in everyday substances like automobile paint, crystal and batteries. He further stated that there was no lead, barium or antimony found on the samples taken from the interior of the Neon's doors.

After the state rested, the defendant mounted a defense based on the theories of misidentification and alibi. In support of those theories, he presented evidence in an effort to give the jury another perspective on the identity of the perpetrator of the crime.

First, Julia Thomas testified that on March 26, 2001, between 12:30 p.m. and 1 p.m., she arrived at her home in Hartford and found the defendant visiting her son Tyrell. She further stated that the defendant stayed for another ten to fifteen minutes and, as he was leaving, told her that "his girl was waiting outside for him" and that he had to "take his girl, go with his girl wherever they had to go." She testified that when she arrived at home, she did in fact see a woman sitting outside in a

"little white car" and that she thought there was a "little kid" in the backseat of the car.

On cross-examination, the state challenged her ability to accurately recall the date of the defendant's visit. At the state's prodding, Julia Thomas conceded that she may have informed an officer that she did not recall the exact date the defendant was at her house; however, she further stated that she knew the date when she was first interviewed about the incident and presently recalled that date.

The defense also offered the testimony of Rooty Thomas, who stated that she was with the defendant at her home in Meriden on the morning of March 26, 2001, and took him in her Neon to see his friend "Rel" in the south end of Hartford at around 12:30 p.m. or 1 p.m. She also testified that at the time she dropped the defendant off, he was wearing "a do-rag" and a black baseball cap, a description that was somewhat inconsistent with those given by Pagan and Molina.[4]

The defense then called Molina to testify as a witness to show, inter alia, that Molina's memory had been influenced by Pagan's version of the events and that Molina's ability to recall the events was flawed. Molina testified that he did not speak with Pagan prior to giving his statement to the police a few days after the incident. Upon further probing by the defense, however, Molina contradicted that testimony by stating that he had spoken to Pagan in the hospital before giving his statement to the police and that Pagan had told him what had happened.

Molina also stated that, since leaving the hospital, he sometimes gets bad migraines and "can't even think straight." In addition, he testified that he knew of no

---

[4] Molina testified that the driver of the Neon was wearing glasses and a "do-rag" at the time of the shooting while Pagan testified that the driver had a cornrow hairstyle with a white headband and shaded glasses.

reason why someone would have committed this crime against him. Finally, he testified that he smoked marijuana two weeks prior to the shooting.

As its final witnesses, the defense called Rocco Orlando III, Molina's attending physician, and Alan Wu, the director of Hartford Hospital's chemistry and toxicology laboratories. The testimony of both of those men challenged the credibility of Molina as well as his ability to recall accurately the identity of the driver of the Neon. Wu testified that Molina's medical report indicated that his urine tested positive for the presence of marijuana on March 26, 2001. Similarly, Orlando testified that Molina received a prescription for pain medication even though Molina had testified that he only received a prescription for antibiotics. Orlando also called into question Molina's ability to accurately recall the incident by testifying that Molina's recall ability was mildly deficient. When asked if Molina's memory is reliable, Orlando stated that "[a]t the time . . . the psychologist noted a mind deficiency there."

On cross-examination, Orlando added that Molina was alert, oriented and speaking at the hospital. He also noted that the medical report dated March 27, 2001, indicated that Molina had "detailed recall of the events" and that the deficits suffered by Molina "were not so severe as to impair his ability to recognize people." On redirect examination, Orlando then indicated that recall and recognition were different functions, and that although the defendant had no problem with recognition, his recall ability was mildly deficient.

Once the defense concluded the presentation of its case, the state recalled Weaver and Inspector James Flaherty as rebuttal witnesses. Weaver testified that Rooty Thomas stated to him that the defendant had asked to use her Neon on the morning of March 26, 2001, that she had assented to this request, and that

she had not been aware of the location of the vehicle until Weaver contacted her after the shooting. Flaherty testified that he spoke to Julia Thomas regarding the case in September, 2001, and that she was unable to specify the date the defendant was at her home.

On March 20, 2002, the jury found the defendant guilty on both counts. The court rendered judgment in accordance with that verdict and at sentencing merged the convictions and imposed a twenty year sentence of imprisonment. This appeal ensued.

The defendant maintains that the court improperly excluded testimony to the effect that the white Neon allegedly involved in the shooting was at a different location at the time of the shooting. As previously noted, the state's theory of the case was that the defendant was operating a white Dodge Neon leased by Rooty Thomas at the time of the shooting. In support, the state proffered the testimony of two eyewitnesses to the incident, Molina and Pagan. Both men stated that the defendant was driving a white Dodge Neon at the time of the incident, which they identified as Rooty Thomas' leased Neon. In addition, a picture of Rooty Thomas' Neon had been entered into evidence.

The defendant, however, relied on misidentification and alibi theories of defense and, as noted, in support of those theories, attempted to introduce evidence through, among others, Rooty Thomas. Rooty Thomas testified that the defendant was at her Meriden home on the morning of March 26, 2001. She also stated that she drove the defendant to his friend Rel's house in the south end of Hartford at around 12:30 p.m. or 1 p.m. At that point, the state objected on the ground that this testimony constituted alibi evidence and, because the defendant had not served notice of his intention to call Rooty Thomas as an alibi witness, the court should preclude Rooty Thomas from offering such testimony.

After the court excused the defendant and the jury from the courtroom, a colloquy ensued between the court and defense counsel. Defense counsel stated that the witness was going to testify that, inter alia, at the time of the shooting, she and her son were in the north end of Hartford in the Neon.[5] The state asserted that the testimony should be prohibited as a sanction for the defendant's failure to comply with the applicable alibi disclosure rules. Specifically, the state argued that testimony concerning the location of the car was alibi evidence since the state's theory was that the defendant was driving the Neon at the time of the shooting and, therefore, testimony suggesting that the car was elsewhere necessarily intimated that the defendant was not at the scene of the crime. The state asserted that because the testimony was alibi testimony, it should be prohibited because the defendant failed to disclose Rooty Thomas as an alibi witness in accordance with Practice Book § 40-21. The defendant, however, argued that the proffered testimony was not alibi testimony because it concerned the location of the Neon at the time of the shooting and not the location of the defendant at that time. The defendant added that because the proffered testimony was not alibi evidence, he was not obligated to disclose it in advance to the state, and, therefore, the court was not authorized by Practice Book § 40-5 to prohibit it as a sanction for noncompliance with § 40-21.

The court sustained the state's objection, stating: "[T]he only reason why the vehicle is relevant is because

---

[5] Rooty was also expected to testify that, on the date of the shooting, she dropped the defendant off at Julia Thomas' house between 12:30 p.m. and 1 p.m. and returned and picked him up at 2 p.m. The court found that this testimony was also alibi evidence and, consequently, disallowed it on the same ground. The defendant, however, does not challenge that ruling on appeal. Thus, when referring to "the proffered testimony" we refer only to the testimony concerning the location of the Neon in the north end of Hartford at the time of the shooting.

its link—it's intrinsically linked to the defendant. To say the car is elsewhere is to say the defendant is elsewhere. That's an alibi." On the basis of its conclusion, the court precluded testimony concerning "where the car was on March 26, 2001, after 1 p.m." as a sanction for the defendant's technical and substantive noncompliance with the rules of practice governing the disclosure of an alibi defense.

On appeal, the defendant claims that the court's preclusion of that testimony violated his right to present a defense as secured by the sixth amendment to the federal constitution and, therefore, he is entitled to a new trial. We agree.

At the outset, we note that the defendant's claim requires us to resolve three questions. First, whether the court's ruling was improper. *State* v. *Saunders*, 267 Conn. 363, 385, 838 A.2d 186, cert. denied, 541 U.S. 1036, 124 S. Ct. 2113, 158 L. Ed. 2d 722 (2004). Should we answer that question in the negative, we need go no further. Should we answer that question in the affirmative, the second question we must answer is whether that impropriety rises to the level of a constitutional violation. Id. Should we answer that question in the affirmative as well, the third question we must answer is whether the state has demonstrated that the constitutional impropriety was harmless beyond a reasonable doubt. *State* v. *William C.*, 267 Conn. 686, 706, 841 A.2d 1144 (2004). A negative answer to this third question will warrant a new trial. E.g., id., 709–10.

Thus, in assessing the merit of the defendant's claim, we begin by reviewing the propriety of the court's ruling. That task requires us to decide whether the court correctly determined that it had the authority under Practice Book § 40-5 to exclude the subject testimony as a sanction for noncompliance with Practice Book § 40-21, which governs a defendant's notice of alibi.

Because the answer to this question relies principally on our interpretation of the scope and meaning of §§ 40-5 and 40-21, our review is plenary. See *Chase Manhattan Mortgage Corp.* v. *Burton,* 81 Conn. App. 662, 665–66, 841 A.2d 248, cert. denied, 268 Conn. 919, 847 A.2d 313 (2004) (interpretation of rule of practice engenders plenary review).

Section 40-5 (4) permits the court to sanction as it deems appropriate a party who *fails to comply* with the notice requirements pertaining to the defense of alibi. This includes "[p]rohibiting the noncomplying party from introducing specified evidence." Practice Book § 40-5. Section 40-21 sets forth the relevant notice requirements. It obligates the defendant to notify the state, in writing, of his intention to rely on an alibi defense, providing the names and addresses of the witnesses *who will testify in support of that alibi defense.*[6]

In the present case, the defendant does not contend that he complied with § 40-21. Instead, he argues that § 40-21 was not applicable since the proffered testimony was not alibi testimony and, therefore, the court did not have the authority to exclude it under § 40-5. The court, however, disagreed and ruled that because the testimony did support an alibi defense about which the defendant failed to give the required notice, the defendant was precluded from offering it at trial. Thus, the question before us is whether the proffered testimony falls within the purview of the notice of alibi provision set forth in § 40-21.

[6] Practice Book § 40-21 provides: "Upon written demand filed by the prosecuting authority stating the time, date, and place at which the alleged offense was committed, the defendant shall file within twenty days, or at such other time as the judicial authority may direct, a written notice of the defendant's intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi."

As a preface to addressing that question, we note that the defendant has a constitutional right to present a defense. *State* v. *Cerreta*, 260 Conn. 251, 260–261, 796 A.2d 1176 (2002). It is well settled that that right is not violated by a rule that requires the defendant to disclose his alibi witnesses to the state because reciprocal duties requiring disclosure to the defendant are also imposed upon the state. *State* v. *Boucino*, 199 Conn. 207, 212, 506 A.2d 125 (1986). Nevertheless, that rule is to be strictly construed so as to avoid constitutional infirmity. See *State* v. *Angell*, 237 Conn. 321, 327, 677 A.2d 912 (1996) (stating that rules of criminal procedure are to be strictly construed to protect constitutional right to liberty). With that tenet in mind, we now turn to whether the proffered testimony falls within the scope of § 40-21.

In answering this question, we apply the well established rules of statutory construction. See, e.g., id. (stating that rules of statutory construction apply with equal force to rules of practice). "[T]he process of statutory interpretation involves a reasoned search for the intention of the legislature." (Internal quotation marks omitted.) *Bojila* v. *Shramko*, 80 Conn. App. 508, 515, 836 A.2d 1207 (2003). Applying that principle to the present case, we seek to give effect to the intent of the drafters of §§ 40-5 and 40-21. *Chase Manhattan Mortgage Corp.* v. *Burton*, supra, 81 Conn. App. 667. We can ascertain that intent from the text of the rule itself if, "after examining that text and considering its relationship to other statutes, the meaning of the text is plain and unambiguous, and does not yield absurd or unworkable results. See Public Acts 2003, No. 03-154, § 1." *Bramwell* v. *Dept. of Correction*, 82 Conn. App. 483, 487, 844 A.2d 957 (2004). Accordingly, in attempting to discern the meaning of § 40-21, we must first look to its text.

The text of § 40-21 is clear. It requires disclosure of all witnesses the defendant intends to call to give

testimony in support of his *alibi*. Section 40-21, however, does not define the term "alibi," nor is that term defined in any other section of the Practice Book. It is appropriate, therefore, that we construe the term alibi in a manner that is consistent with its commonly approved meaning. See *State* v. *Pare*, 253 Conn. 611, 628, 755 A.2d 180 (2000). The word "alibi" is defined as "[a] defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time." Black's Law Dictionary (7th Ed. 1999). Given that definition, we interpret § 40-21 to require the defendant's disclosure of all witnesses expected to testify that the defendant was at a location that would have rendered it impossible for him to commit the crime.

Here, the proffered testimony concerned the location of the vehicle the state maintains the defendant was driving at the time of the crime. Although this testimony intimates that the defendant could not have been driving Rooty Thomas' Neon at the time of shooting, it does not place the defendant at the relevant time in a location different from the scene of the crime and so removed therefrom as to render it impossible for him to be the guilty party. In fact, it does not facially concern the location of the defendant at the time of the crime. It is not, therefore, the type of testimony contemplated by § 40-21. Accordingly, we hold that the defendant was not under a duty to disclose it in advance to the state.

Furthermore, because the defendant did not fail to comply with the disclosure rules with regard to the proffered testimony, the court did not have the authority under § 40-5 to preclude it as a sanction. As noted, § 40-5 only permits the court to preclude the specified evidence of a "noncomplying party."[7]

---

[7] Practice Book § 40-5 provides in relevant part: "If a party fails to comply with the disclosure as required under these rules, the opposing party may move the judicial authority for an appropriate order. The judicial authority hearing such a motion may enter such orders and time limitations as it

Given the court's lack of authority to preclude the proffered testimony under § 40-5 and because no other proper foundation exists for its exclusion, we deem improper the court's decision to prohibit it.

Having made that determination, the next question we must address is whether the court's improper ruling rises to the level of a constitutional violation. *State* v. *Saunders*, supra, 267 Conn. 385. It is well established that under the sixth amendment to the United States constitution, made applicable to the states through the fourteenth amendment, a criminal defendant must be afforded a meaningful opportunity to present a complete defense. *State* v. *Cerreta*, supra, 260 Conn. 260–61. "Whether a trial court's erroneous restriction of a . . . defense [witness'] testimony in a criminal trial deprives a defendant of . . . [that right] is a question that must be resolved on a case by case basis. . . . The primary consideration in determining whether a trial court's ruling violated a defendant's right to present a defense is the centrality of the excluded evidence to the claim or claims raised by the defendant at trial." (Internal quotation marks omitted.) *State* v. *Saunders*, supra, 267 Conn. 385.

In the present case, if the subject testimony had been admitted and credited it would have undermined the credibility of the state's only eyewitnesses, Molina and Pagan. In doing so, it also would have called into question the state's theory of the case that implicated the use of Rooty Thomas' vehicle in the shooting. It was, therefore, relevant to the defense because it would have permitted the defendant to establish that both Molina and Pagan lacked the ability to recall accurately the events leading up to the shooting as well as the identity of the individuals involved. Given that Molina and Pagan

deems appropriate, including, without limitation . . . (4) Prohibiting the noncomplying party from introducing specified evidence . . . ."

were the only witnesses who identified the defendant as the driver of the vehicle involved in the crime, we conclude that the excluded testimony was material to the misidentification defense asserted by the defendant. The court's improper restriction of that testimony was, therefore, of constitutional dimension as it transgressed the defendant's right under the sixth amendment to present a defense.

Having reached the foregoing conclusions, the final determination we must make is whether the court's constitutional impropriety harmed the defendant. See *State* v. *William C.*, supra, 267 Conn. 706. In conducting a harmlessness analysis we look to see if the improperly excluded evidence may have had a tendency to influence the judgment of the jury. *State* v. *Smith*, 73 Conn. App. 173, 201, 807 A.2d 500, cert. denied, 262 Conn. 923, 812 A.2d 865 (2002). If so, the court's exclusion cannot be considered harmless. Id.

Our review of the record reveals that the state's case was not so overwhelming as to render harmless the court's improper ruling. To the contrary, the state's case primarily rested on whether the jury believed the version of the facts as told by the state's chief witnesses, Molina and Pagan.[8] As noted previously, if Rooty Thomas' testimony concerning the location of the vehicle had been admitted and credited, the versions of the facts as told by Molina and Pagan would have been undermined. Under these circumstances, we are not persuaded that the proffered evidence, if admitted, would not have had a tendency to influence the judgment of the jury. Consequently, we conclude that its exclusion was not harmless beyond a reasonable doubt. Accordingly, a new trial is warranted.

---

[8] This is because the physical evidence concerning the presence of gunshot residue was inconclusive and the discovery of the defendant in proximity to the car approximately twelve hours after the incident was sufficiently removed in time to be minimally probative.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.