TRENDEL TUTSON *v.* COMMISSIONER
OF CORRECTION
(AC 32988)

Robinson, Bear and Keller, Js.

Argued April 15—officially released July 16, 2013

*Temmy Ann Pieszak*, chief of habeas corpus services, with whom, on the brief, was *Rebecca I. Bodner*, assistant public defender, for the appellant (petitioner).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Jo Anne Sulik*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

KELLER, J. The petitioner, Trendel Tutson, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. The petitioner claims that the habeas court abused its discretion when it denied the petition for certification to appeal and that the court improperly (1) failed to read all of the exhibits introduced at the habeas proceeding and that this failure is reflected in gross factual errors in the court's decision; (2) concluded that he was not prejudiced by his trial counsel's mishandling of his alibi defense; and (3) concluded that he received effective assistance from his trial counsel. Because the petitioner has failed to demonstrate that the court improperly

denied the petition for certification to appeal, we dismiss the appeal.

In 2002, the petitioner was convicted of attempt to commit murder in violation of General Statutes §§ 53a-54a and 53a-49, and assault in the first degree in violation of General Statutes § 53a-59 (a) (5). He was sentenced to twenty years incarceration. After considering the claims raised by the petitioner in his direct appeal, this court, concluding that the trial court violated the petitioner's right to present a defense, reversed the judgment of conviction and remanded the case for a new trial. *State* v. *Tutson*, 84 Conn. App. 610, 627–28, 854 A.2d 794 (2004). Following a grant of certification to appeal; *State* v. *Tutson*, 271 Conn. 935, 861 A.2d 511 (2004); our Supreme Court reversed this court's judgment, and remanded the case to this court to consider a claim that this court, in its earlier decision, did not resolve. *State* v. *Tutson*, 278 Conn. 715, 718, 899 A.2d 598 (2006). Following that remand, this court affirmed the judgment of conviction. *State* v. *Tutson*, 99 Conn. App. 655, 915 A.2d 344 (2007).

The facts underlying the petitioner's conviction were set forth previously by this court, as follows: "[O]n March 26, 2001, between 1 and 1:30 p.m. . . . Ernesto Molina was driving a 1992 red Volkswagen Jetta on Bond Street in Hartford, looking to buy marijuana. Molina was joined by two passengers, Jorge Pagan, Molina's best friend, who sat in the front passenger seat, and Michael Alvarado, who sat in a backseat. As the vehicle traveled on Bond Street, Molina and Pagan noticed a small white car traveling toward them in the opposing lane. They also noticed that there was a passenger in the front seat. As the cars passed, Molina and Pagan saw the face of the driver of the white car.

"After the vehicles passed, the white car turned around and, with increasing speed, began following the

red Jetta on Bond Street. Molina and Pagan noticed this and became concerned. In an attempt to elude the car, Molina increased his speed to eighty-five to ninety-five miles per hour and drove through stop signs and traffic lights. Molina ultimately turned onto Brownell Avenue and the white car did the same. As the cars were traveling at fifty-five miles per hour, Molina looked in his rearview mirror and saw a long black pole, which he thought was a rifle, come out of the driver's side window of the white car and turn in the direction of the Jetta. Molina then heard a noise and felt something strike the back of his head. A large caliber bullet had pierced the back of the Jetta and traveled through the vehicle's trunk and passenger compartment. A fragment of that bullet lodged in the back of Molina's head. Although injured, Molina kept driving, turning right onto Broad Street and continuing to Hartford Hospital. The white car did not follow the Jetta, turning left onto Broad Street instead.

"At the hospital, the police immediately were notified of the incident. They arrived at the hospital shortly thereafter and briefly spoke with Molina, Pagan and Alvarado regarding the shooting. The police also conducted a formal interview of Pagan at the police station during which Pagan described the driver and passenger of the white car.

"Approximately one hour after arriving at the hospital, the police were contacted by the security department from the Learning Corridor (Corridor). The police were told that a member of the Corridor's security personnel was walking to lunch between 1 and 1:30 p.m., when he heard what sounded like a gunshot resonating from Brownell Avenue. The police also were notified that this security officer searched Brownell Avenue after he learned about the shooting and recovered a twelve gauge shotgun shell from the north side of the street. The police ultimately took the shell into their

possession. At that time, it was neither dirty nor rusty and did not appear to have been on the street for a long time. The shell, however, was never tested for fingerprints. The police also took a videotape from the Corridor's exterior surveillance camera. That tape revealed that two vehicles, one red, one white, were on Brownell Avenue and that the red vehicle turned right onto Broad Street while the white vehicle turned left. Neither gunfire nor the make of the vehicles could be discerned from the video. In addition, the video was time-stamped in a manner that made it unclear that the events depicted actually occurred on March 26, 2001.

"Approximately twelve hours after the shooting, at roughly 2 a.m. on March 27, 2001, Pagan, while driving to a gas station to buy a beverage, observed that he was being followed by the [petitioner] in a white Dodge Neon (Neon). Pagan immediately notified police officers that the vehicle that had been involved in the earlier shooting was following him. The police located the Neon and pursued it, but it fled, turning its headlights off in the process. Shortly thereafter, the police located the vehicle in the rear yard of 51 Whitmore Street. The vehicle appeared abandoned; the engine was not running, although it was still warm, and the doors were wide open. A short distance away, the police found the [petitioner] and Philip Washington hiding beneath some cars. Thereafter, the police brought Pagan to the scene where he positively identified the [petitioner] as the driver of the Neon in the earlier shooting and Washington as its passenger.

"The police subsequently discovered that Rooty Thomas, who lived in Meriden, was the lessee of the Neon. Once contacted, Rooty Thomas gave the police permission to search the vehicle.

"The police performed gunshot residue tests on the hands of the [petitioner] and Washington as well as on

the exterior and interior surfaces of the driver's and passenger's doors of the Neon. These tests disclosed lead particles on the palm of the [petitioner]'s left hand as well as on the back of his right hand. They further revealed the presence of lead, barium and antimony on the palm of Washington's left hand and lead particles on the exterior of the vehicle's passenger door.

"On April 5, 2001, Molina identified the [petitioner] from a photographic array shown to him by the Hartford police, and on March 8, 2002, Pagan did the same. No weapon was ever recovered.

"Trial of this matter began on March 11, 2002. The state alleged that the [petitioner] was guilty of criminal attempt to commit murder and assault in the first degree as either a principal or an accessory. The [petitioner]'s theory of the case was that the eyewitnesses misidentified him as the perpetrator of the crime because, at the relevant time, he was at a location other than the scene of the crime and, therefore, he could not have committed it.

"In support of its case, the state offered the testimony of two eyewitnesses. The first was Molina who testified, inter alia, that he was positive that the [petitioner] was the driver of the Neon during the shooting. He also identified Rooty Thomas' leased Neon as the vehicle involved in the incident, and he identified the [petitioner] as its driver.

"The second eyewitness offered by the state was Pagan. Pagan testified that the car involved in the shooting was a white Dodge Neon and that he recognized it and the [petitioner] as its driver from his previous observations of the [petitioner] and the Neon in his neighborhood. He also said he recognized the passenger in the Neon, although he did not know his name. Pagan further stated that he initiated a conversation with the [petitioner] on March 4, 2002, in which the [petitioner]

told him that he 'had no beef with' him, that he wanted Pagan to help him, and that he wanted Pagan to apologize to Molina for him. Finally, he testified that he had never had any problems with the [petitioner] prior to the incident. Pagan also provided an in-court identification of the [petitioner] as the driver of the Neon.

"During cross-examination, defense counsel brought out an inconsistency in Pagan's testimony. Although Pagan's statement to the police indicated that he saw the passenger side window of the Neon down during the chase, at trial he testified that he saw the driver's side window down. In an effort to explain himself, Pagan stated that he never said that to the police. Upon reading his statement, he testified that he was mistaken and that the driver's side window was down. Pagan then testified that '[a]t the time . . . I wasn't really thinking about—I didn't even want to do the statement' and, later, that his statement was right the whole time but that sometimes he can get confused.

"Defense counsel also elicited testimony from Pagan that he had discussed the identification of the driver of the Neon with Molina after March 26, 2001. Defense counsel elicited that testimony in an attempt to show that Pagan influenced Molina's memory of the events. Finally, Pagan testified that he had a criminal case pending in Hartford.

"Detective Andrew Weaver, the officer in charge of the investigation, also testified for the state. According to Weaver, the bullet hole in the Jetta was consistent with a 'shotgun round' also classified as 'a hunting slug or a one ounce deer-type slug.' Weaver also testified that the suspect vehicle was described as a 'Dodge Neon white in color' and that a lead fragment was recovered from the Jetta which was consistent with twelve gauge 'shotgun slug ammunition.'

"On cross-examination, Weaver testified that Molina's statement to the police only described the occupants of the Neon as 'two black males' and that he could not remember if Molina identified the vehicle as a white Dodge Neon. The state also offered as evidence the expert testimony of Fung Kwok, a criminalist at the state forensic laboratory. Kwok's testimony concerned the results of the gunshot residue tests performed on the Neon, the [petitioner] and Washington. Kwok stated that given the absence of barium and antimony in the results of the testing done on the [petitioner] and the Neon, it was 50 percent conclusive that the residue found was gunshot residue, but testing was 100 percent conclusive that the residue found on Washington was from a gunshot. Kwok further stated that, in his opinion, that was not a positive finding that the [petitioner] fired a gun, but it was a positive finding that Washington fired a gun.

"During cross-examination, Kwok acknowledged that the [petitioner] could have gotten lead on his hands from a number of activities because lead is 'very, very common in the environment' and is found in everyday substances like automobile paint, crystal and batteries. He further stated that there was no lead, barium or antimony found on the samples taken from the interior of the Neon's doors.

"After the state rested, the [petitioner] mounted a defense based on the theories of misidentification and alibi. In support of those theories, he presented evidence in an effort to give the jury another perspective on the identity of the perpetrator of the crime.

"First, Julia Thomas testified that on March 26, 2001, between 12:30 p.m. and 1 p.m., she arrived at her home in Hartford and found the [petitioner] visiting her son Tyrell. She further stated that the [petitioner] stayed for another ten to fifteen minutes and, as he was leaving,

told her that 'his girl was waiting outside for him' and that he had to 'take his girl, go with his girl wherever they had to go.' She testified that when she arrived at home, she did in fact see a woman sitting outside in a 'little white car' and that she thought there was a 'little kid' in the backseat of the car.

"On cross-examination, the state challenged her ability to accurately recall the date of the [petitioner]'s visit. At the state's prodding, Julia Thomas conceded that she may have informed an officer that she did not recall the exact date the [petitioner] was at her house; however, she further stated that she knew the date when she was first interviewed about the incident and presently recalled that date.

"The defense also offered the testimony of Rooty Thomas, who stated that she was with the [petitioner] at her home in Meriden on the morning of March 26, 2001, and took him in her Neon to see his friend 'Rel' in the south end of Hartford at around 12:30 p.m. or 1 p.m. She also testified that at the time she dropped the [petitioner] off, he was wearing 'a do-rag' and a black baseball cap, a description that was somewhat inconsistent with those given by Pagan and Molina.

"The defense then called Molina to testify as a witness to show, inter alia, that Molina's memory had been influenced by Pagan's version of the events and that Molina's ability to recall the events was flawed. Molina testified that he did not speak with Pagan prior to giving his statement to the police a few days after the incident. Upon further probing by the defense, however, Molina contradicted that testimony by stating that he had spoken to Pagan in the hospital before giving his statement to the police and that Pagan had told him what had happened.

"Molina also stated that, since leaving the hospital, he sometimes gets bad migraines and 'can't even think

straight.' In addition, he testified that he knew of no reason why someone would have committed this crime against him. Finally, he testified that he smoked marijuana two weeks prior to the shooting.

"As its final witnesses, the defense called Rocco Orlando III, Molina's attending physician, and Alan Wu, the director of Hartford Hospital's chemistry and toxicology laboratories. The testimony of both of those men challenged the credibility of Molina as well as his ability to recall accurately the identity of the driver of the Neon. Wu testified that Molina's medical report indicated that his urine tested positive for the presence of marijuana on March 26, 2001. Similarly, Orlando testified that Molina received a prescription for pain medication even though Molina had testified that he only received a prescription for antibiotics. Orlando also called into question Molina's ability to accurately recall the incident by testifying that Molina's recall ability was mildly deficient. When asked if Molina's memory is reliable, Orlando stated that '[a]t the time . . . the psychologist noted a mind deficiency there.'

"On cross-examination, Orlando added that Molina was alert, oriented and speaking at the hospital. He also noted that the medical report dated March 27, 2001, indicated that Molina had 'detailed recall of the events' and that the deficits suffered by Molina 'were not so severe as to impair his ability to recognize people.' On redirect examination, Orlando then indicated that recall and recognition were different functions, and that although the [petitioner] had no problem with recognition, his recall ability was mildly deficient.

"Once the defense concluded the presentation of its case, the state recalled Weaver and Inspector James Flaherty as rebuttal witnesses. Weaver testified that Rooty Thomas stated to him that the [petitioner] had asked to use her Neon on the morning of March 26,

2001, that she had assented to this request, and that she had not been aware of the location of the vehicle until Weaver contacted her after the shooting. Flaherty testified that he spoke to Julia Thomas regarding the case in September, 2001, and that she was unable to specify the date the [petitioner] was at her home." *State v. Tutson*, supra, 84 Conn. App. 612–20.

On February 23, 2010, the petitioner filed an amended petition for a writ of habeas corpus. In count one, he alleged that his trial counsel, Sylvia Reid, provided ineffective assistance in a variety of ways. He alleged that Reid failed to file motions to suppress certain out-of-court identifications of him made by Pagan and Molina and to pursue an adequate alibi defense.[1] In count two, the petitioner sought the restoration of his right to sentence review. In an oral decision,[2] the habeas court rejected the petitioner's claim of ineffective assistance, but restored the petitioner's right to sentence review.

Thereafter, the petitioner filed a petition for certification to appeal pursuant to General Statutes § 52-470 as

[1] By way of background, we note that, at the petitioner's criminal trial, Reid represented to the court that she intended to present testimony from Rooty Thomas that, at the time of the shooting, she and her son were in her white Neon in the north end of Hartford. *State v. Tutson*, supra, 84 Conn. App. 621. The state objected on the ground that any testimony about the location of the automobile at the time of the shooting "necessarily intimated that the [petitioner] was not at the scene of the crime," and, as such, was alibi testimony. Id. The state argued that the court should exclude such testimony because the defense failed to disclose Rooty Thomas as an alibi witness in accordance with the applicable rules of practice. Id. The court agreed with the state and precluded Rooty Thomas' testimony concerning the location of the automobile on March 26, 2001, after 1 p.m. Id., 622. Subsequently, our Supreme Court upheld the trial court's determination in this regard; the court rejected the petitioner's claim that the testimony did not constitute an alibi and determined that the trial court did not abuse its discretion in precluding the testimony as a sanction for the petitioner's failure to disclose it in accordance with the applicable rules of practice. *State v. Tutson*, supra, 278 Conn. 737–41.

[2] Subsequently, the court created a memorandum of decision in compliance with Practice Book § 64-1 (a).

well as an application for waiver of fees, costs and expenses and appointment of counsel on appeal.[3] After the court denied the petition for certification to appeal, this appeal followed.[4] Additional facts will be set forth as necessary in the context of the petitioner's claims.

"We begin by setting forth the applicable standard of review and procedural hurdles that the petitioner must surmount to obtain appellate review of the merits of a habeas court's denial of the habeas petition following denial of certification to appeal. In *Simms* v. *Warden*, 229 Conn. 178, 187, 640 A.2d 601 (1994), we concluded that . . . § 52-470 (b) prevents a reviewing court from hearing the merits of a habeas appeal following the denial of certification to appeal unless the petitioner establishes that the denial of certification

---

[3] The petitioner utilized judicial branch forms in filing his petition for certification to appeal and his related application. In both, he incorporated by reference an additional filing entitled "PETITION FOR CERTIFICATION TO APPEAL," in which he petitioned "for certification to appeal the following issues:

"1. Whether the habeas court erred in failing to consider or decide Petitioner's claim that Attorney Sylvia Reid never filed a motion to suppress the one-man show-up identification of Petitioner made by Jorge Pagan on March 27, 2001.

"2. Whether in light of the evidence, the habeas court erred in finding that any presumption of reasonableness on the part of Attorney Sheila Iverson negated any deficient performance on the part of Attorney Sylvia Reid.

"3. Whether on the basis of the record, the court erred in implicitly finding that Attorney Sheila Iverson was involved in any of the tactical decisions raised by Petitioner.

"4. Whether the habeas court erred in finding that the testimony of Rooty Thomas did not 'rise to the level of alibi' testimony, though she testified that she was with Petitioner at the time of the shooting he was charged and convicted of."

We note that, in this appeal, the petitioner does not raise any claims of error that are related to issues two and three of his petition for certification to appeal.

[4] The court granted the petitioner's application for waiver of fees, costs and expenses and appointment of counsel on appeal, waiving all fees and costs incident to an appeal as well as appointing counsel from the Office of Chief Public Defender.

constituted an abuse of discretion by the habeas court. In *Simms* v. *Warden*, 230 Conn. 608, 615–16, 646 A.2d 126 (1994), we incorporated the factors adopted by the United States Supreme Court in *Lozada* v. *Deeds*, 498 U.S. 430, 431–32, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991), as the appropriate standard for determining whether the habeas court abused its discretion in denying certification to appeal. This standard requires the petitioner to demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . A petitioner who establishes an abuse of discretion through one of the factors listed above must then demonstrate that the judgment of the habeas court should be reversed on its merits. . . . In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Castonguay* v. *Commissioner of Correction*, 300 Conn. 649, 657–58, 16 A.3d 676 (2011). Having set forth the standard of review, we will consider the merits of the claims raised by the petitioner.

I

First, the petitioner claims that the court improperly failed to read all of the exhibits introduced at the habeas proceeding and that this failure is reflected in gross factual errors in the court's decision. It is undisputed that the petitioner introduced as exhibits in the present habeas proceeding ten volumes of transcript from his underlying criminal trial. The petitioner urges us to conclude that the timing of the hearing and the issuance of the court's oral decision denying his petition for a

writ of habeas corpus reflects that the court did not read the transcript in its entirety prior to rendering its decision, although there is no statement made to or by the court on this point. The petitioner asserts that this failure is reflected in certain erroneous findings made by the court, specifically, its finding that it was unclear whether Reid had filed any pretrial motions to suppress evidence and its finding that, at a suppression hearing held during the trial, the trial court had considered the admissibility of Pagan's out-of-court identification of him as well as certain statements made by him to Pagan on March 4, 2002.

As our standard of review set forth previously makes clear, an appeal following the denial of a petition for certification to appeal from the judgment denying a petition for a writ of habeas corpus is not the appellate equivalent of a direct appeal from a criminal conviction. Our limited task as a reviewing court is to determine whether the habeas court abused its discretion in concluding that the petitioner's appeal is frivolous. Thus, we review whether the issues for which certification to appeal was sought are debatable among jurists of reason, a court could resolve the issues differently or the issues are adequate to deserve encouragement to proceed further. See, e.g., id. Because it is impossible to review an exercise of discretion that did not occur, we are confined to reviewing only those issues which were brought to the habeas court's attention in the petition for certification to appeal.

The record does not reflect that before the habeas court the petitioner raised the present claim of the habeas court's failure to read all of the exhibits prior to rendering its decision. More importantly, the petitioner did not raise the present claim in his petition for certification to appeal. See footnote 3 of this opinion. Because the petitioner did not raise the claim when asking the court to rule on his petition for certification

to appeal, we cannot conclude that the court abused its discretion on that ground. See *Mercado* v. *Commissioner of Correction*, 85 Conn. App. 869, 872, 860 A.2d 270 (2004) (habeas court could not have abused discretion in denying petition for certification to appeal because claim at issue was not raised in petition for certification to appeal), cert. denied, 273 Conn. 908, 870 A.2d 1079 (2005). "This court has determined that a petitioner cannot demonstrate that the habeas court abused its discretion in denying a petition for certification to appeal if the issue that the petitioner later raises on appeal was never presented to, or decided by, the habeas court. . . . Under such circumstances, a review of the petitioner's claims would amount to an ambuscade of the [habeas] judge. . . . *Because the petitioner failed to raise this claim in his petition for certification to appeal or in his application for waiver of fees, costs and expenses and appointment of counsel on appeal,* we decline to afford it review." (Citations omitted; emphasis added; internal quotation marks omitted.) *Perry* v. *Commissioner of Correction*, 131 Conn. App. 792, 796–97, 28 A.3d 1015 (petitioner's claim that trial court issued oral decision from bench in absence of counsel not reviewable when claim not raised in petition for certification to appeal), cert. denied, 303 Conn. 913, 32 A.3d 966 (2011); see also *Melendez* v. *Commissioner of Correction*, 141 Conn. App. 836, 841, 62 A.3d 629 (2013) (improper to consider issues not raised distinctly before habeas court in petition for certification to appeal); *Campbell* v. *Commissioner of Correction*, 132 Conn. App. 263, 267, 31 A.3d 1182 (2011) (consideration of issues not distinctly raised in petition for certification to appeal would amount to ambuscade of habeas judge). For the foregoing reasons, we decline to review this claim.

II

Next, the petitioner claims that the court improperly concluded that he was not prejudiced by his trial counsel's mishandling of his alibi defense. We conclude that

the court properly denied the petition for certification to appeal with regard to this claim.

At the habeas trial, the petitioner presented evidence that, at his criminal trial, Reid did not disclose Rooty Thomas as an alibi witness and that the trial court, having heard Reid's representations concerning Rooty Thomas' testimony, later precluded Reid from presenting testimony from Rooty Thomas about the location of her automobile at the time of the shooting. See footnote 1 of this opinion.

Also, at the habeas trial, the petitioner presented testimony from Rooty Thomas that, at approximately 12:30 p.m. on March 26, 2001, she was with the petitioner in Hartford, waiting for him in her automobile at the residence of the petitioner's friend, identified as "Rel." At that time, she received a telephone call from her sister, who asked her to pick up her nephew from school in New Haven. She stated that, at approximately 1 p.m., she and the petitioner left Hartford and drove to New Haven, which took approximately thirty minutes. After picking up her nephew in New Haven, she and the petitioner went to her sister's residence in New Haven for a brief time before traveling from New Haven to her residence in Meriden, which took approximately fifteen minutes. She testified that the petitioner was with her the entire time during these events and that he remained with her after they returned to Meriden. Additionally, Rooty Thomas testified that she was contacted by Reid two or three days before trial and that she conveyed these facts to her and indicated that she was willing to testify at the petitioner's trial.

The petitioner argued before the habeas court that, because the state's theory of the case was that the crime occurred between 1 and 1:30 p.m. on March 26, 2001, Rooty Thomas' version of events constituted an alibi because it established that the petitioner was at a place

different from the Hartford crime scene at the time of the alleged offense. The petitioner argued that Reid was deficient for failing to present this as alibi testimony at trial, noting that this testimony "[fit] in squarely with his alibi defense" at trial from Julia Thomas, who testified at trial that the petitioner was visiting her son, Tyrell, at her residence in Hartford at 1 p.m. on March 26, 2001, and that, at that time, she observed a woman and her child in an automobile parked near her residence.

In rejecting the petitioner's claim of ineffective assistance of counsel, the habeas court stated in relevant part: "[T]he only alibi evidence that was not presented is the testimony of [Rooty] Thomas, and based upon the testimony presented to the habeas court, the court will make a finding that [Rooty Thomas'] testimony does not [rise] to the level of establishing an alibi. At best, it would corroborate the evidence presented by Julia Thomas, which the jury heard, and nevertheless, returned a finding of guilty beyond a reasonable doubt.

"So, while it appears that Ms. Reid may have been guilty of . . . deficient performance in not filing an appropriate notice of alibi defense, it's crystal clear that such failure did not operate to the prejudice of the petitioner. Consequently, the court cannot find that there was ineffective assistance of trial defense counsel."

The petitioner argues that the court's finding that he did not suffer prejudice was based on an erroneous determination that Rooty Thomas' testimony did not rise to the level of an alibi. Additionally, he argues that the court improperly concluded that the testimony at issue merely corroborated that of Julia Thomas. We will address both of these contentions in turn.

"The interpretation of a trial court's judgment presents a question of law over which our review is plenary.

. . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The interpretation of a judgment may involve the circumstances surrounding the making of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole." (Citation omitted; internal quotation marks omitted.) *Sosin* v. *Sosin*, 300 Conn. 205, 217–18, 14 A.2d 307 (2011).

As a preliminary matter, we are not persuaded that the court determined that Rooty Thomas' testimony at the habeas trial did not rise to the level of an alibi. We recognize that the court, in its oral decision, at one point stated that the testimony at issue did not rise to the level of establishing an alibi. This statement, however, is surrounded by several statements that clearly evinced a determination by the court that Rooty Thomas' habeas testimony was, in fact, alibi testimony. The court referred to Rooty Thomas as "the alibi witness," described her testimony as "alibi evidence" and stated that Reid was deficient insofar as she did not file "an appropriate notice of alibi defense" with regard to this witness. An examination of the totality of the court's analysis reflects that it considered the testimony at issue to be alibi testimony. Accordingly, we conclude that the court properly denied the petition for certification to appeal with regard to this aspect of the petitioner's claim.

The second aspect of the petitioner's claim focuses on the propriety of the court's conclusion that Reid's failure to present Rooty Thomas' alibi testimony was not prejudicial because it corroborated the testimony

of Julia Thomas at the petitioner's criminal trial.[5] As a preliminary matter, the petitioner argued before the habeas court that Rooty Thomas' testimony "fits in squarely" with the alibi defense presented at trial, namely, that Julia Thomas observed him at her residence at approximately 1 p.m. on the day of the shooting. The petitioner acknowledges in his appellate brief that, at the habeas trial, "Rooty Thomas testified . . . in a manner that was absolutely consistent with and corroborated by the testimony of Julia Thomas at the criminal trial." The petitioner, however, urges us to conclude that Reid's conduct was prejudicial because the testimony was more significant than that of Julia Thomas in that it provided an explanation of the petitioner's whereabouts after he left Julia Thomas' residence at or about the time of the shooting.

As set forth previously, in his petition for certification to appeal, the petitioner did not raise a claim related to the habeas court's determination that Reid's failure to present Rooty Thomas' alibi testimony was not prejudicial. See footnote 3 of this opinion. On the basis of the authority set forth in part I of this opinion, we decline to review this aspect of the claim.

## III

Next, the petitioner claims that the court improperly concluded that he received effective assistance from his trial counsel. An examination of his analysis of this claim reflects that it is directed at Reid's alleged failure (1) to file motions to suppress identification procedures

---

[5] As set forth previously in this opinion, Thomas testified at trial that, between 12:30 p.m. and 1 p.m. on the date of the shooting, she arrived at her home in Hartford and found the petitioner visiting with her son. She saw a female and a child sitting in an automobile outside of her residence and, when the petitioner left approximately ten to fifteen minutes later, he stated that he had to take his girlfriend somewhere.

employed in this case, (2) to investigate fully the petitioner's alibi defense and (3) to file a timely notice of alibi defense related to Rooty Thomas.

First, we address the aspect of the claim related to identification procedures employed in this case. The petitioner's appellate arguments are broad and appear to encompass all of the identification procedures used by police in this case. In his petition for a writ of habeas corpus, the petitioner raised claims related to Reid's failure to challenge several allegedly suggestive identification procedures, namely, Pagan's March 27, 2001 showup identification of the petitioner, Pagan's March 8, 2002 identification of the petitioner by means of a photographic array and Molina's April 5, 2002 identification of the petitioner by means of a photographic array. As indicated in part I of this opinion, in this appeal from the court's denial of certification to appeal, we are limited to those claims raised by the petitioner in his petition for certification to appeal. In that filing, the petitioner identified a claim related to the habeas court's failure "to consider or decide Petitioner's claim that Attorney Sylvia Reid never filed a motion to suppress the one-man show-up identification of Petitioner made by Jorge Pagan on March 27, 2001."[6]

---

[6] There is no authority by which a petitioner may challenge a judgment denying a petition for a writ of habeas corpus solely by demonstrating that the habeas court failed to consider a claim raised in his petition for a writ of habeas corpus. Stated otherwise, a petitioner cannot demonstrate that the court made an error that affected the result of the proceeding unless he demonstrates that, in its resolution of one or more of the claims properly before it, the court made an error of such magnitude that warrants reversal of its judgment. For this reason, we "will not consider claims not raised in the habeas petition or [*not*] *decided by the habeas court.*" (Emphasis added.) *Henderson* v. *Commissioner of Correction*, 129 Conn. App. 188, 198, 19 A.3d 705, cert. denied, 303 Conn. 901, 31 A.3d 1177 (2011).

"It is the responsibility of the appellant to provide an adequate record for review . . . ." Practice Book § 60-5. "*It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record . . . to ask the trial judge to rule on an overlooked matter.*" (Emphasis in original; internal quotation marks omitted.) *Bowden* v. *Commissioner of Correction*, 93 Conn. App. 333, 343, 888 A.2d 1131, cert. denied, 277 Conn.

The court's memorandum of decision does not appear specifically to address the petitioner's claim related to the March 27, 2001 showup identification of the petitioner by Pagan. The court discussed statements attributed to Pagan as well as "the photo array identification," presumably made by Pagan, concluding that the petitioner failed to demonstrate that a motion to suppress related to this evidence would have been granted. Thereafter, the petitioner filed a motion for articulation in which he asked the habeas court, inter alia, to address his claim that Reid was ineffective for failing to file a motion to suppress the out-of-court showup identification made by Pagan on March 27, 2001. The habeas court denied the motion for articulation, stating: "The petitioner did not introduce appropriate evidence at the habeas trial. Court's ruling applies to all grounds stated."[7]

Contrary to the claim raised in the petition for certification to appeal, the record reflects that the court, by way of its articulation stating that the petitioner failed to present appropriate evidence in support of his claim at the habeas trial, addressed the claim set forth in the petition for a writ of habeas corpus related to Reid's failure to file a motion to suppress Pagan's March 27, 2001 showup identification of the petitioner. For this reason, we conclude that the court did not abuse its discretion by denying the petition for certification to appeal with regard to this aspect of the present claim.

The remaining aspects of the present claim relate to Reid's investigation of and failure to present the alibi

924, 895 A.2d 796 (2006). The rules of practice governing articulation and appellate review of orders related thereto; see Practice Book §§ 66-5 and 66-6; provide an adequate procedure by which an appellant may obtain review of claims that were not addressed adequately or were overlooked by the a trial court. *Bowden* v. *Commissioner of Correction*, supra, 342.

[7] This court granted the petitioner's motion for review of the court's ruling on the motion for articulation, but denied the petitioner's request for relief.

defense set forth by Rooty Thomas at the habeas trial. The petitioner did not identify these claims in his petition for certification to appeal. See footnote 3 of this opinion. On the basis of the authority set forth in part I of this opinion, we do not reach the merits of these claims.

The appeal is dismissed.

In this opinion the other judges concurred.